REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND


No. 957

September Term, 2013


BALFOUR BEATTY CONSTRUCTION, *et al.*

v.

MARYLAND DEPARTMENT OF GENERAL
SERVICES, *et al.*


Woodward,
Wright,
Leahy,

JJ.


Opinion by Leahy, J.


Filed:  December 2, 2014


*Judge Daniel Friedman did not participate,
pursuant to Md. Rule 8-605.1, in the Court's
decision to report this opinion.

The State of Maryland considers a litany of factors when determining which company's proposal it will select for the completion of a prominent State construction project. Unlike the selection of a contractor in the private sector, the process for the State is governed by the Maryland Administrative Procedure Act and Maryland procurement law. The question in this case concerns whether the State properly concluded that (1) it could consider a novel specification without triggering the Maryland APA's rulemaking process and (2) the specification encourages "maximum practicable competition" under Maryland procurement law.

In late 2011, the State of Maryland issued a request for proposals ("RFP") for Construction Management at Risk Services for a new detention facility to replace the rundown and unsafe buildings that house male juvenile offenders at the Cheltenham Youth Facility in Prince George's County (the "Project"). Prior to the submission of proposals, Balfour Beatty Construction, Coakley & Williams Construction, Hensel Phelps Construction, and Manhattan Construction ("Protestors") jointly filed a pre-award protest with the Maryland Department of General Services ("DGS" or "Agency"). Protestors challenged the State's inclusion of a Project Labor Agreement ("PLA") as one of the factors used to evaluate technical proposals. DGS responded by amending the RFP to clarify that inclusion of a PLA was not mandatory and extended the date for submission of proposals.

The procurement officer denied the protest, and Protestors appealed to the Maryland State Board of Contract Appeals ("MSBCA" or "Board"), where the Agency's

decision was ultimately affirmed. Protestors filed a Petition for Review in the Circuit

Court for Baltimore City. The matter comes before this Court from the circuit court's

June 19, 2013 order affirming the MSBCA's determinations.

Balfour Beatty Construction, Coakley & Williams Construction, and Manhattan

Construction ("Appellants")[1] present two questions on appeal, which we have rephrased:

    I.    Did the MSBCA err in failing to find that inclusion of a PLA as a
factor in ranking proposals establishes a procurement preference
for organized labor and constitutes an unprecedented change in
state policy mandating formal rulemaking under the Maryland
Administrative Procedure Act?

    II.    Did the MSBCA err in failing to set aside the challenged RFP
because it discriminates in favor of offerors who commit to adopt
a PLA, thereby restricting competition in violation of Maryland
procurement law?

For the reasons set forth below, we hold that a novel specification included in a single

RFP, without more, does not change existing procurement law or formulate a new policy

of widespread application or future effect and, therefore, does not mandate predicate

rulemaking under the Maryland Administrative Procedure Act ("Maryland APA"). We

also find that the record before the MSBCA contained substantial evidence to support its

decision that the PLA specification was reasonably related to the needs of the State while

encouraging the maximum practicable competition.

---

[1]    Hensel Phelps Construction participated in the protest and appeal before the
MSBCA and in the Petition for Judicial Review in the circuit court, but does not join in
the appeal to this Court.

3

**Cheltenham Youth Detention Center Project**

The Cheltenham Youth Facility is operated by the Maryland Department of Juvenile Services and is located on approximately 900 acres in southern Prince George's County, Maryland, near U.S. Highway 301. First opened in 1870 as a school for boys, Cheltenham has served as the primary detention facility for male delinquent youths from many parts of the State. As stated in the Agency Report filed by DGS,[2] the purpose of the facility today is to house and educate delinquent male youths between the ages of 12 and 18 years who are considered too dangerous to return to their homes and who are awaiting court disposition or trial in Anne Arundel, Prince George's, Calvert, Charles and St. Mary's Counties.

By all accounts, the residential cottages located on the Cheltenham campus are outdated, inefficient, and unsafe. Other administrative buildings are in various stages of deterioration. The Project centers on replacing deteriorated buildings on the campus with a 72-bed state-of-the-art detention facility and a regional warehouse. When complete, the new detention center, designed to combine the functions of the existing campus buildings into one facility, will be the first of its kind in Maryland. The proposed 99,000 gross square foot facility—with space for housing, administration, admissions and release, somatic and behavioral health, food service, education, recreation, visitation, staff

---

[2]     DGS Agency Report at p. 3, filed in *Balfour Beatty Constr.*, MSBCA 2803 (2012).

training, storage and maintenance—will be significantly larger and more complex than facilities ordinarily built by DGS.

Plans for the Project began in 2005 following a determination by the Department of Juvenile Services that the current facilities were obsolete.[3]  The Project went through several design changes and finally appeared in its current form in the Governor's 2011 capital improvement plan for fiscal years ("FY") 2012-2016.  In 2011, the Project was estimated at approximately $48 million and was expected to take longer than three years to complete.  Phase I of the Project (pre-construction/design phase) was expected to run about 14 months, and Phase II (construction phase) was anticipated to take about 24 months to complete.

During 2011, DGS officials explored the use of PLAs for Juvenile Justice facilities generally and on the Cheltenham Project specifically.  A PLA is a negotiated pre-hire agreement between a construction manager (here, the CM at Risk), and a designated collective-bargaining representative for all employees on a particular project.  51 C.J.S. Labor Relations § 311 (2014).  In order to perform work on a project covered by a PLA, a contractor must sign the PLA and agree that no labor strikes or disputes will disrupt the

---

[3]     *See* Office of Capital Budgeting, Maryland Department of Budget and Management, *FY 2006-2010 Capital Improvement Plan*, 92-93 (2005), *available at* http://www.dbm.maryland.gov/agencies/ca-pbudget/Documents/FY2006-2010Capital ImprovementPlan/juvserv.pdf.

project. *Id.*[4] Typically, PLAs covering public works projects require that bidders are or become bound by the PLA but do not restrict bidding to union contractors or limit work to union members.[5]

In a letter dated October 18, 2011, the Maryland Secretary of State wrote to the Vice President of the Laborer's International Union of North America, stating that the State was "allowing various stakeholders an opportunity to comment on the final draft of the proposed criteria for a [PLA] relating to the Cheltenham [Project]." He explained that, with respect to whether the State would institute a policy encouraging use of PLAs on projects over $25 million, "we are going to evaluate our experience with this

---

[4]     The use of PLAs on publicly funded projects dates back to the 1938 construction of the Grand Coulee Dam in Washington State. U.S. Gov't Accountability Office, Rep. No. GGD-98-82, *Project Labor Agreements: The Extent of Their Use and Related Information* at 4–5 (1998). Since that time, PLAs have been used on numerous large-scale public and private projects including the Trans-Alaska Pipeline, Walt Disney World, and the Kennedy Space Center. *Id*

[5]     Henry H. Perritt, Jr., *Keeping the Government Out of the Way: Project Labor Agreements Under the Supreme Court's Boston Harbor Decision*, 12 Lab. Law. 69, 87 (1996). Indeed, at the state level the appropriateness of using a PLA on a public project often hinges, in part, upon the presence in the PLA itself of a provision prohibiting discrimination on the basis of union membership. *Compare N.Y. State Chapter, Inc. v. N.Y. State Thruway Auth.*, 666 N.E.2d 185, 191 (1996) (upholding the Thruway Authority's use of a PLA, stating "the PLA cannot be said to promote favoritism or cronyism because the PLA applies whether the successful bidder is a union or nonunion contractor and discrimination against employees on the basis of union membership is prohibited"), *with George Harms Const. Co. v. N.J. Tpk. Auth.*, 644 A.2d 76, 83-84 (1994) (rejecting as violative of the state's competitive bid statutes a bid specification requiring contractors and subcontractors "to enter into a project-labor agreement with the New Jersey BCTC, an AFL–CIO organization comprised of several different unions representing various crafts").

upcoming procurement and then decide how we may want to proceed on future procurements."

**RFP for Construction Management at Risk Services**

On November 9, 2011, DGS issued an RFP for Construction Management at Risk Services for the Cheltenham Project, designated No. DC-455-090-001 ("Cheltenham RFP"), pursuant to Maryland Code (1988, 2009 Repl. Vol.), State Finance and Procurement Article ("SFP"), §13-103 and Code of Maryland Regulations ("COMAR") 21.05.03 (Competitive Sealed Proposals).[6] DGS determined that the Construction Management at Risk ("CM at Risk") delivery method was best suited to deal with the magnitude and complexity of the Project.[7] Authorized under COMAR, the CM at Risk is defined as:

> [A] project delivery method wherein a construction manager provides a range of preconstruction services and construction management services which may include, but are not limited to, cost estimation and consultation regarding the design of the project, prequalifying and evaluating trade contractors and subcontractors, awarding the trade contracts and subcontracts, scheduling, cost control, and value engineering.

---

[6] Typically, competitive sealed proposals are used for the procurement of "human, cultural, or educational services" where price is not the sole criterion for selection. SFP §§ 13-102(b); 13-104(a). An RFP must include a statement of: (i) the scope of the procurement contract, including the expected degree of minority business enterprise participation; (ii) the factors, including price, that will be used in evaluating proposals; and (iii) the relative importance of each factor. SFP § 13-104(b)(2).

[7] DGS is designated a "primary procurement unit" authorized to enter into certain specified procurement contracts on behalf of other state agencies, including architectural, engineering, and construction related services. SFP §§ 11-101(l); 12-107(b)(3).

COMAR 21.05.10.01B(1). Typically, the CM assumes all risks for cost, scheduling, and performance of trade contracts.

The Cheltenham RFP prescribes CM at Risk services during both pre-construction and construction phases of the Project and requires that, "[i]n order to be considered, all firms must agree [] to the Guaranteed Maximum Price ("GMP") of Forty-Eight Million, Three Hundred Nine Thousand Dollars ($48,309,000.00)." (Cheltenham RFP, Section 00300, Article 2(C)(1)). The CM serves as a cost estimator and project coordinator during the design phase and as the general contractor during construction. The CM's responsibilities include developing schedules, preparing construction cost models and estimates, conducting value engineering and labor conditions studies, managing change order review and quality assurance inspections, and advising on the sequencing of the construction work. The "Project Team" comprises the State of Maryland, the CM, the Architects/ Engineer(s), and other project consultants. (Cheltenham RFP, Section 00400, Article 1(A)(5)).

Section 00300, Article 2, establishes the scope of the Project and identifies the factors for DGS to consider when evaluating the proposals:

**B.** **Evaluation Factors for Award**

1. Basis for Award

> The Procurement Officer shall make a determination recommending award of the contract to the responsible offeror whose proposal is determined to be the most advantageous to the State, considering price and the evaluation factors set forth in the request for proposals.

8

2. Technical Proposal Evaluation

The following technical factors shall be used by the Evaluation Committee to evaluate technical proposals. **The factors are listed in descending order of importance.**

Technical Evaluation Factors

a. Experience of Firm
b. Management Approach
c. Key Personnel
d. Past Performance of Firm
e. Labor/Trade Apprenticeship and Training Program
f. **Project Labor Agreement (include previous experience with PLA projects)**[8]
g. Economic Benefits to the State

3. Price

All offers must include reasonable prices. The Procurement Officer may reject offers containing prices determined to be unreasonably high or low.

4. Minority Business Enterprise Participation Goal

The PLA cannot be a basis for waiver of MBE participation goals required by this solicitation.

(Emphasis added).

Subsection D, entitled "Technical Proposal Requirements," includes detailed instructions regarding the requirements for each of the technical evaluation factors listed

---

8 This provision was revised by Addendum No. 2 to read, "The presence of a Project Labor Agreement."

in Article 2, subsection B (2). Although subsequently amended, Subsection D.6 entitled "Project Labor Agreement" originally provided:[9]

    a. The firm shall provide at least two (2) examples of projects which they have managed where a Project Labor Agreement (PLA) was used and briefly describe their experience in developing and working with the PLA

    b. The firm shall provide a statement affirming their intent to establish and use a PLA in accordance with Section 00840 of this RFP.

The CM is required to negotiate any PLA in good faith with all relevant labor organizations that have jurisdiction over the trades involved in construction of the Project. Qualifying PLAs must contain a provision that the contractor and all subcontractors are able to compete for contracts without regard to their participation in any other collective bargaining agreements. PLAs must guarantee against strikes, lockouts, and similar job disruptions; and include provisions that set forth effective, prompt, and mutually binding procedures for resolving labor disputes.

---

[9] Subsection D.6 (a) was later removed from the RFP via Addendum No. 2, and subsection D.6 (b) was revised by Addendum No. 4 to read, "[i]f the offeror intends to use a Project Labor Agreement (PLA), it shall provide a statement affirming its intent to establish and use a PLA in accordance with Section 00840."

**November 21, 2011 Pre-Proposal Conference**[10]

On November 21, 2011, procurement officer Myrna L. Harris presided over the pre-proposal conference for the Project. Representatives from a number of firms attended, including Turner Construction Company, Inc., Skanska USA Building, Inc., Hunt Construction Group, Inc., Gilbane, Inc., and The Whiting-Turner Contracting Company, Inc.

At the conference, Ms. Harris explained the RFP process, reiterating that any changes to the RFP would be provided by addenda and that offerors should acknowledge the receipt of such addenda in their technical proposals. She also discussed the submittal process, including that offerors are to submit a two-part proposal consisting of 1) a technical proposal, and 2) a price proposal. She noted that the RFP provides that technical and price proposals are given equal weight, and that the technical evaluation criteria is listed in order of importance. Mr. Stephen Gilliss, DGS Project Manager, briefly described the scope of the Project and clarified that, among other things, Phase I of the Project was not part of the GMP. The meeting was then opened for questions, and attendees inquired about various issues, including funding for the Project, the addenda

---

[10] Pursuant to COMAR 21.05.03.02 and 21.05.02.07, a pre-proposal conference may be conducted by the procurement officer to explain the procurement requirements. The conference meeting is announced to all prospective offerors who were sent an RFP or who are known by the procurement officer to have obtained a copy of the RFP. COMAR 21.05.02.07(B). Attendance is typically not mandatory. COMAR 21.05.02.07(C).

process, and the approximate timeline for the award. No one submitted a question related to the evaluation factor regarding PLAs.

**The Pre-Award Bid Protest**

One day after the pre-proposal conference, on November 22, 2011, Protestors filed a joint pre-award bid protest pursuant to COMAR 21.10.02, challenging DGS's use of a PLA as an "unprecedented" evaluation factor. Specifically, Protestors argued that the inclusion of the PLA evaluation factor "compel[led] offerors responding to the RFP to agree to enter into a Project Labor Agreement as a condition of receiving full consideration for award of the Project," thereby unduly restricting competition in violation of SFP § 13-205(a) and creating "a radical new procurement policy" in violation of the rulemaking provisions of the APA, Maryland Code (1984, 2009 Repl. Vol., 2010 Supp.), State Government Article ("SG") § 10-110. According to Protestors, the "restrictive PLA preference" discriminated against them and their non-union subcontractors because they did not have established relationships with Maryland's labor organizations and their "employees and likely subcontractors do not want to work on a project covered by a PLA." Moreover, Protestors contended, *inter alia*, that their non-union contractors and subcontractors would be unable to use their own employees for the Project and would likely have to pay duplicative costs for various union benefit programs. Protestors charged that the PLA evaluation factor was a "preference" that violated Maryland's public policy favoring "Maximum Practicable Competition," and

that the RFP did not "contain any explanation or proof of need for a restrictive PLA preference."

**Addenda**

Before issuing her decision on the Protest, the procurement officer issued two addenda to the RFP that affected the PLA evaluation factor. First, Addendum No. 2, issued on December 27, 2011, modified evaluation factor "f" so that firms were no longer required to demonstrate prior experience with PLAs. Thus, the language of Subsection B.2 (f) was changed from "Project Labor Agreement (include previous experience with PLA projects)" to "[t]he presence of a Project Labor Agreement." Also, item a. of subsection D.6 was deleted, removing the requirement that a firm provide examples of past projects on which it used PLAs.

Second, Addendum No. 4, issued on February 7, 2012, extended the due date for technical and price proposals to February 23, 2012, and revised subsection D.6 to read as follows:

> If the offeror intends to use a Project Labor Agreement (PLA), it shall provide a statement affirming its intent to establish and use a PLA in accordance with Section 00840 of this RFP.

This Addendum also added a provision requiring PLAs to include "provisions prohibiting discrimination on the basis of union membership." Finally, in subsection 5, the prior language, "[f]ailure to furnish such evidence of the required PLA within the above-referenced timeframe … shall be deemed a material flaw in the Contractor's proposal,"

13

was modified to read "[f]ailure to furnish the PLA… *may constitute a default under the CM contract*." (Emphasis added).

Addendum No. 5, issued on February 23, 2012, extended the due date for the receipt of proposals to March 1, 2012.

**Final Decision on Protest**

Ms. Harris issued her Final Decision denying the protest on February 21, 2012. She decided that the PLA evaluation factor contained in the Cheltenham RFP, as amended, was not prohibited because it was not expressly proscribed by COMAR or Maryland procurement law, nor was the PLA an express requirement under the RFP.

Regarding the reasonableness of including a PLA as an evaluation criterion, Ms. Harris noted that "any PLA must include certain protections for the State against problems that might arise and impede progress," including guarantees against strikes or similar job disruptions; procedures for prompt resolution of labor disputes; and mechanisms for labor-management cooperation. Therefore, Ms. Harris found that DGS had provided adequate grounds for including a PLA as an evaluation factor for the Project given its size and complexity. She observed that amendments to the RFP clarified that use of a PLA was not a contract requirement, and determined:

> Any offeror may submit an offer and at its choice may offer, or not offer, a PLA. Should an offeror choose not to offer a PLA it is not excluded from competition for award. To the contrary, it may submit an offer which it considers to be a superior proposal in terms of experience, approach, price … and may, in its proposal, choose to demonstrate why its proposal is DGS's best option without a PLA. *This is especially so in this solicitation, since DGS must consider the technical proposal equally with price.*

(Emphasis added).

Ms. Harris discussed how use of a PLA as an evaluation factor did not discriminate against non-union subcontractors:

> Should an offeror choose to include the use of a PLA in its proposal, by the express requirements of Section 00840, any such PLA must "allow the [Construction Manager] and all Subcontractors to compete for contract and subcontracts without regard to whether they are otherwise parties to any other collective bargaining agreements" and "contain provisions prohibiting discrimination of [sic] the basis of union membership." Thus, non-union labor firms will have the same opportunity as union firms.

She found that the solicitation was not unduly restrictive because the PLA was only one of seven evaluation factors for the technical proposal (which is only accorded 50 percent value under this RFP), and that it was ranked "of low importance." Ultimately, Ms. Harris concluded that the inclusion of a PLA was reasonable and nondiscriminatory, and did not constitute a change in procurement policy. Protestors appealed to the MSCBA on February 22, 2012.

**Award to Turner Construction**

DGS received seven proposals on March 1, 2012, in response to the Cheltenham RFP, including one from Appellant Manhattan Construction. Each proposal contained a PLA. On May 23, 2012, the Maryland Board of Public Works unanimously approved the award of the contract to Turner Construction pursuant to COMAR 21.10.02.11A, which provides:

15

A. If the authority to award a contract has not been delegated to a department pursuant to COMAR 21.02.01.04, and a timely protest or appeal has been filed, the contract may be executed only if either:

    (1) The Board of Public Works finds that execution of the contract without delay is necessary to protect substantial State interests; or

    (2) The Appeals Board issues a final decision concerning the appeal. If a contract is to be executed pursuant to §A(1) of this regulation, the procurement agency shall so notify the Appeals Board.

Turner began providing preconstruction services shortly thereafter, and construction began in November of 2013.[11]

---

[11]     In the event it is determined that an awarded contract violates the procurement code, the contract becomes voidable at the option of the Board of Public Works. The applicable statute, SFP § 11-204, provides in pertinent part:

(c) *Contracts voidable for noncompliance*

(1) Whenever a procurement violates this Division II, the Board may determine that the procurement contract is voidable, rather than void, if the Board determines that:

(i) all parties acted in good faith;

(ii) ratification of the procurement contract would not undermine the purposes of this Division II; and

(iii) the violation or series of violations was insignificant or otherwise did not prevent substantial compliance with this Division II.

(2) Whenever a procurement contract is voidable under this subsection and the contractor has not acted in violation of this Division II, the unit may:

(i) ratify the procurement contract if the unit determines that ratification is in the best interests of the State; or

(ii) void the procurement contract and award the contractor compensation for actual expenses reasonably incurred under the contract, plus a reasonable profit.

**MSBCA Appeal**

Protestors timely appealed to the MSBCA, and in their memorandum in support thereof, Protestors introduced the affidavit of economist Anirban Basu, Chairman and CEO of Sage Policy Group, Inc. Mr. Basu's affidavit asserts that his research regarding the impact of PLAs on the DC-Maryland construction industry led him to conclude that PLAs are likely to (1) burden non-union contractors and business owners (adding that disadvantaged business owners are overwhelmingly nonunion); (2) have adverse impact on local economies; (3) diminish opportunities for pre-existing skilled non-union workers; (4) result in unsafe work practices and poor construction outcomes; (5) generate large inefficiencies; and (6) result in increased price without realizing any benefits.

Mr. Basu also states that a survey conducted by the Associated Builders and Contractors of Maryland ("ABC") revealed that "more than 98% of ABC member contractors and subcontractors were less likely to bid on a public construction project that is covered by a PLA." Moreover, Mr. Basu states that according to his research, comparable government projects in Maryland encountered none of the problems—labor-related disruptions, delays, and inefficiencies—identified by DGS in the RFP as grounds for inclusion of the PLA evaluation factor.

DGS submitted an Agency Report,[12] which included, among other documents, a March 2012 assessment of the Cheltenham facility issued by Grimm & Parker Architects, and a study prepared by Fred Kotler, J.D. supporting the use of PLAs on public projects and upon which DGS relied, in part, in preparation of the RFP specifications. *See* Fred B. Kotler, J.D., *Project Labor Agreements in New York State: In the Public Interest*, Cornell Univ. (2009). Mr. Kotler addresses general allegations that PLAs are anti-competitive and explains:

> Because union and non-union contractors are free to bid on projects covered by PLAs, they avoid the favoritism that competitive bidding laws are designed to prevent. Awards are frequently made to both union and non-union companies. Those same contractors are not required to become union contractors, that is, signatories to the respective area craft agreement, but only to become signatories to the PLA.

*Id.* at p. 12.

In response to the Agency Report, the Protestors moved for summary decision, claiming that the State failed to conduct market research or a study of labor conditions in Maryland such as that performed by Mr. Basu and, therefore, contending the State produced no *prima facie* evidence to justify the PLA evaluation factor. The State's reply included the Affidavit of Assistant Secretary for DGS, Mr. Bart Thomas. In his affidavit, Mr. Thomas asserts that the use of a PLA "gives owners and contractors a unique opportunity to anticipate and avoid problems that might arise and possibly impede

---

[12] COMAR 21.10.07.03 requires the Office of Attorney General prepare and submit to the MSBCA an agency report that fully responds to the allegations set forth in the notice of appeal and that sets forth the agency's findings, actions and recommendations.

progress." Mr. Thomas maintains that he concluded, based upon research and communications with various union and non-union contractors and the Maryland Department of Labor, Licensing and Regulation ("DLLR"), among others, that PLAs in large-scale projects (1) help provide a dedicated, trained workforce; (2) boost local economies; (3) facilitate apprenticeship and job training programs; (4) promote project stability and safety; (5) promote project efficiency, (6) provide a planned approach to labor relations and more accurate prediction of labor costs; and (7) assure timely completion.[13]

Following submission of the record and competing affidavits, the MSBCA heard oral argument on September 20, 2012. After final briefing, the Board issued its decision denying the appeal on November 16, 2012.

At the outset, the Board acknowledged that under SFP § 13-205(a)(1) and attendant regulations,[14] the law is clear that a procurement specification may not unduly

---

[13]    Appellants claim that these "entirely new grounds" appear for the first time in Mr. Thomas's *post-hoc* affidavit." However, the record contains a memorandum by Mr. Thomas dated November 9, 2011, authored contemporaneously with the release of the RFP, in which he discusses the very same grounds for the State's consideration of whether a PLA is part of a proposer's construction plan in response to the Cheltenham RFP. In this earlier memorandum, Mr. Thomas also advises, "[s]ince the PLA is only one of the evaluation factors, a contractor can submit a proposal without the PLA and still could be the selected vendor."

[14]    SFP § 13-205 (a)(1)("a unit [of state government] shall draft [procurement] specifications to encourage maximum practicable competition without modifying the [legitimate] requirements of the State"); COMAR 21.01.02(A) (containing nearly identical language); COMAR 21.04 .01.03 ("To the extent practicable, functional or (continued . . .)

19

restrict competition. *Balfour Beatty*, MSBCA 2803 at 4, ___ MSBCA ¶ __ (2012) (citing *Xerox Corp.*, MSBCA 1111, 1 MSBCA ¶ 48 (1983)).[15] The Board also instructed that, "it is for the government as procuring entity, and not the function of private vendors, to determine what restrictions may reasonably be imposed to achieve the State's procurement goals." *Id.* at 5. Although the State enjoys "great latitude" in its determination, the State is prohibited from steering contracts to a particular vendor. *Id.* In order to defend its specifications, the government must simply assert reasonable cause for a restrictive bid or proposal requirement. The Board noted that "the more restrictive a specification may be, the greater the justification that the State may be fairly required to assert." *Id.* at 5-6. Once the State satisfies this showing, the protestor has a "considerable burden" to prove by a preponderance of the evidence that the restriction is unreasonable. *Id.* at 5 (citing *Xerox Corp., supra; The Trane Co.*, MSBCA 1264, 2 MSBCA ¶ 118 (1985)).

The Board found that the challenged specification—the PLA evaluation factor—is not highly restrictive:

---

performance criteria shall be emphasized while limiting design or other detailed physical descriptions to those necessary to meet the needs of the State."); COMAR 21.04.01.04 ("The procurement officer … shall be responsible for reviewing the specifications … to insure that the specification is nonrestrictive.").

[15]    MSBCA opinions up to and including year 2006 are published in bound volumes, copies of which can be found at the MSBCA library and in the libraries of the Maryland law schools and the Maryland Court of Appeals. Opinions from 1997 through 2014 are available through the MSBCA website at www.msbca.state.md.us.

> The RFP at issue does not even impose the requirement of a PLA. Any qualified offeror was free to submit a proposal in response to this RFP with or without a PLA … The contested specification in this RFP simply allows the State to consider the potential benefit to the State of selecting a proposal with a PLA in place. In addition, the option of including a PLA in a proposal was assured by the State to be afforded the weight of only the sixth most important of a total of seven evaluations factors.

*Id.* at 6. The MSBCA concluded "the alleged restriction is slight, even giving appellant the benefit of classifying the allowance of consideration of a PLA as a restriction at all."

*Id.* That the degree of restrictiveness was small, the Board added, is evidenced by the fact that not one, but seven separate proposals were submitted to the State, each proposing use of a PLA. *Id.*

Turning to the State's justification for including the PLA evaluation factor, the Board first acknowledged that the parties advanced affidavits containing diametrically opposing perspectives. The Board stated:

> It is not for the Board to determine which view is correct. The Board does not substitute its judgment for that of the state agency that identifies its procurement methods and desires and must later live with the consequences of its settled procurements.

*Id.* at 9 (citing *Lottery Enterprises, Inc.*, MSBCA No. 1680; 4 MSBCA ¶ 314, at 8 (1992)). The Board explained that its seminal function is "merely to decide whether the State's determinations to give consideration to an offeror's proposal to use a PLA is rationally or reasonably related to the State's identification of its construction needs." The Board found that the evidence adduced by Protestors did not prove an abuse of discretion by DGS and so declined to disturb the agency's decision. Inclusion of a PLA

21

as an evaluation criterion in the Cheltenham RFP, the Board found, had no general application or future effect and, therefore, it did not constitute a new regulation subject to the formal rulemaking procedures required by the Maryland APA. *Id.* at 11.[16] In its final analysis, the Board posed the rhetorical question, "[c]an the same contractor claim through its experts that juvenile detention center should be built using a different construction approach in other respects, or perhaps not build at all? The answer is of course not." *Id.* at 12. Pursuant to SG § 10-222 and SFP § 15-223, the Protestors sought review of the MSBCA decision in the Circuit Court for Baltimore City. From that court's order denying Protestors' Petition for Review, Appellants filed their Notice of Appeal with this Court on July 17, 2013.

## II.

**A Single Specification Does Not a Regulation Make**

On the question of whether the PLA evaluation factor constituted an unprecedented change in State policy mandating predicate rulemaking under the Maryland APA, we review the Board's decision *de novo*. *Salisbury University v. Joseph*

---

[16] The Board rejected the State's argument that it did not have jurisdiction to consider this question because the statutorily prescribed method of contesting administrative regulations is set forth in SG § 10-125. *Id.* at 10. The Board decided it could address the question pursuant to SFP § 15-211, which provides, "[t]he Appeals Board shall have jurisdiction to hear and decide all appeals arising from the final action of a unit on a protest relating to the formation of a procurement contract." *Id.* The Board also reasoned that if appellants had sought declaratory relief, they would face the challenge that the case was not ripe for adjudication prior to exhaustion of administrative remedies before the Board. The parties have not raised this issue on appeal.

*M. Zimmer, Inc.,* 199 Md. App. 163, 166 (2011) (citing *White v. Workers' Comp. Comm'n.*, 161 Md. App. 483, 487 (2005)). "We bypass the judgment of the circuit court and look directly at the administrative decision." *Id*. The Court of Appeals in *Schwartz v. Maryland Department of Natural Resources*, stated:

> With respect to an agency's conclusions of law, we have often stated that a court reviews *de novo* for correctness. We frequently give weight to an agency's experience in interpretation of a statute that it administers, but it is always within our prerogative to determine whether an agency's conclusions of law are correct, and to remedy them if wrong.

385 Md. 534, 554 (2005) (citations omitted).

Appellants contend that the inclusion of a PLA as an evaluation factor in the Cheltenham RFP establishes an unprecedented preference having general application and future effect; therefore, its adoption without undertaking the formal rulemaking process violated the Maryland APA. Appellants cite an October 18, 2011, letter from the Secretary of State to the Laborer's International Union of North America ("LiUNA") addressing the use of PLAs on juvenile justice facility projects as constituting an agency statement creating new state procurement preferences. Appellants maintain that this is a change in regulation that could not lawfully take place without compliance with the Maryland APA, and as a result, the Cheltenham Project RFP must be set aside.

Appellees, DGS and Turner Construction Company, respond that this first (and, thus far, only) use of a PLA as an evaluation factor did not violate the Maryland APA. As evidenced by the Secretary of State's letter contained in the record, the State and DGS

intended to "evaluate [their] experience with this upcoming procurement [the Cheltenham Project] and then decide how [they] may want to proceed on future procurements." Appellees argue that the use of such an evaluation factor in a single solicitation does not constitute a change in procurement policy because it does not have general application or widespread effect. As such, this one-time use of an evaluation factor is not a "regulation" under the Maryland APA.

The Maryland APA, Title 10, subtitle 1, sets forth certain requirements for the adoption of regulations by executive agencies governed by the APA,[17] thereby establishing a process known as "notice and comment" rulemaking. *See Dep't of Health & Mental Hygiene v. Chimes*, 343 Md. 336, 340 (1996). A unit "may not adopt a proposed regulation" until it has sent a proposed draft to the Attorney General or unit counsel for approval as to legality, SG § 10-107(b), and also to the General Assembly's Joint Administrative, Executive, and Legislative Review Committee ("AELR Committee"), SG § 10-110(c). Next, the proposed regulation must be published in the Maryland Register and be accompanied by a notice that: (1) states the economic impact of the proposed regulation on State and local government revenues and expenditures and on groups that may be affected by it, and (2) sets a date, time, and place for public

---

[17] Subtitle 1 applies to "each unit in the Executive Branch of the State government" and to each unit that is created by public general law and operates in at least two counties. The subtitle does not apply to a unit in the Legislative Branch of the State government, the Injured Workers' Insurance Fund, a board of license commissioners, the Rural Maryland Council, or the Military Department. Maryland Code (1984, 2014 Repl. Vol.), State Government Article §10-102.

hearing. For the next 30 out of the 45 days during which the regulation is published in the Maryland Register, the unit must accept public comment on the proposed regulation.[18] It is undisputed that DGS, in the instant case, failed to follow these procedures. The crucial determination, then, is whether the first-time inclusion of a new bid specification, in light of the present facts, constitutes a "regulation" under the Maryland APA.

Section 10-101(g) of the Maryland APA defines "regulation" as:

(g)(1) "Regulation" means a statement or an amendment or repeal of a statement that:
    (i)     has general application;
    (ii)    has future effect;
    (iii)   is adopted by a unit to:
        1.  detail or carry out a law that the unit administers;
        2.  govern organization of the unit;
        3.  govern the procedure of the unit; or
        4.  govern practice before the unit; and
    (iv)   is in any form, including:
        1.  a guideline;
        2.  a rule;
        3.  a standard;
        4.  a statement of interpretation; or
        5.  a statement of policy.
(2) "Regulation" does not include:
    (i)     a statement that:
        1.  concerns only internal management of the unit; and
        2.  does not affect directly the rights of the public or the procedures available to the public;
    (ii)    a response of the unit to a petition for adoption of a regulation, under § 10-123 of this subtitle; or

---

[18]    The Maryland APA also sets forth a process for the "emergency adoption" of regulations pursuant to SG § 10-111(b).

          (iii)    a declaratory ruling of the unit as to a regulation, order, or statute, under Subtitle 3 of this title.

SG § 10-101.

Maryland courts have consistently held that where an agency action does not "formulate new rules of widespread application, change existing law, or apply [rules] retroactively to the detriment of an entity that had relied on the agency's past pronouncements," there is no regulation in the sense contemplated by the Maryland APA, and the agency need not proceed through formal rulemaking procedures. *Md. Ass'n of Health Maint. Orgs. v. Health Servs. Cost Review Comm'n.*, 356 Md. 581, 601 (1999) (quoting *Chimes*, 343 Md. at 346). Although the Court of Appeals has not recently addressed a case in which the singular use of a bid specification or a "pilot project" was challenged for failing to follow rulemaking procedures, the Court has addressed other instances in which it concluded that an executive agency may proceed in a case-by-case manner.

In *Consumer Protection Division Office of Attorney General v. Consumer Publishing, Co., Inc.*, 304 Md. 731, 753 (1985) ("*Consumer Publishing*"), Consumer Publishing argued that the Division's adjudicatory actions against it were attacking industry-wide practices and that such action had the effect of creating new industry-wide regulation; therefore, the Division should have been required to proceed by rulemaking rather than by adjudication. The Court of Appeals stated that "even if [Consumer Publishing] had proven an industry-wide practice, the Division would not have been

required to proceed by rulemaking," and in support of this statement, the Court quoted

*SEC v. Chenery Corp.,* 332 U.S. 194, 202-03 (1947), stating:

> The function of filling in the interstices of the [statute] should be performed, as much as possible, through the quasi-legislative promulgation of rules to be applied in the future. But any rigid requirement to that effect would make the administrative process inflexible and incapable of dealing with many of the specialized problems which arise.

> \* \* \*

> [T]he agency must retain power to deal with the problems on a case-to-case basis if the administrative process is to be effective. There is thus a very definite place for the case-by-case evolution of statutory standards.

(Internal citations omitted).

In *Maryland Association of Health Maintenance Organizations v. Health Services Cost Review Commission*, the Review Commission sought a methodology that was more efficient and less costly than its original process of conducting individual full rate reviews for each of the 50 hospitals under its jurisdiction. 356 Md. 581 (1999). To that end, the Review Commission implemented an inflation adjustment system ("IAS") as a rate-setting mechanism. *Id.* at 585. At its inception, the IAS method was an experimental program using inflation rates and hospital-specific data, among other factors, to set hospital rates. *Id.* at 590. The experiment proved successful, and within one year, the Review Commission had determined that the IAS method was more

efficient and effective than the full rate review procedure, and adopted the method by resolution. *Id.*

After 22 years of use, the IAS method was challenged on the ground that the Review Commission violated the Maryland APA by adopting it via resolution rather than promulgating it as regulation. *Id.* at 599. The Court of Appeals noted, however, that the change in review methodology did not, even at its inception, represent a change in policy or standards. *Id.* at 602. It was merely a starting point for determining case-by-case individualized needs. *Id.* The Court indicated that this type of change in methodology is comparable to the uses of agency policies in *Chimes* and *Consumer Publishing*, where formal rulemaking was not required. *Id.*

In *Baltimore Gas & Electric. v. Public Services Commission,* the Court of Appeals addressed the Public Service Commission's ("PSC") determination of the appropriate standard for whether a utility's plants were operating at a "reasonable level." 305 Md. 145, 152 (1986). Noting that the PSC's construction of "reasonable level" did not apply "materially modified or new standards ... retroactively to the detriment of a company that had relied upon the Commission's past pronouncements," the Court determined that the PSC was not required to proceed by formal rulemaking. *Id.* at 169. The Court found that to require the promulgation of a rule every time an agency explains the standards it uses in applying a statute "would impose a tremendous and unnecessary burden upon state agencies." *Id.* at 167. In contrast, the Court of Appeals, in *CBS, Inc. v. Comptroller of the Treasury,* required that the agency proceed through formal rulemaking rather than

28

administrative adjudication. 319 Md. 687, 698-99 (1990). In that case, by altering the formula used to compute the taxable income of a multi-state corporation for Maryland income tax purposes, the Comptroller created a "substantially new generally applicable policy." *Id.* at 698. The Court of Appeals explained:

> Unlike the agency action in *Consumer Protection,* it *was* an effective "change [in] existing law" and *did* "formulate rules of widespread application." Unlike the agency action in *Baltimore Gas & Elec.* it *was* "a case ... in which materially modified or new standards were applied retroactively to the detriment of a company that had relied upon the [agency's] past pronouncements."

*Id.* (emphasis in original) (internal citations omitted).

In the present case, there is no dispute that this is the first DGS project involving the potential use of a PLA. The only evidence presented to MSBCA that there were any plans to use PLAs on future projects was the Secretary of State's letter, along with a handful of emails discussing the potential form and legality of PLAs. Appellants contend that the Secretary of State's letter was issued as "a new statement of procurement policy" indicating that the Cheltenham Project "was to be the first of multiple State construction projects intended to be awarded under the State's new … procurement policy promoting PLAs on State construction projects." The letter plainly belies this contention, however, because in it the Secretary of State relates: "we are going to evaluate our experience with this upcoming procurement [the Cheltenham Project] and then decide how we may want to proceed on future procurements."

Significantly, the Maryland Secretary of State does not create procurement policy. Maryland procurement law vests overall power and authority over procurement matters with the Board of Public Works ("BPW"). SFP § 12-101. The endorsement by the Secretary of State of a pilot project for the use of PLAs in large-scale construction projects, no matter how forward looking, does not constitute the promulgation of new procurement policy because the BPW has not delegated such authority to the Secretary of State. SFP § 12-101(b)(4) ("The Board may delegate any of its authority that it determines to be appropriate for delegation and may require prior Board approval for specified procurement actions.").

Accordingly, the MSBCA concluded that this was a "pilot project" and "is neither of general application nor future effect." We agree. The inclusion of the PLA evaluation factor was neither a regulation under SG § 10-101, nor did it herald the implementation of new procurement policy. And, unlike the case in *CBS, Inc. v. Comptroller of the Treasury*, the specification here did not "apply retroactively to the detriment of a company that had relied upon the [agency's] past pronouncements." 319 Md. at 699. Here, the RFP was issued in accordance with all applicable procurement requirements and notice procedures, ensuring that "certain basic principles of common sense, justice and fairness," underlying the Maryland APA were met. *Chimes,* 343 Md. at 338 (internal quotation marks omitted). Indeed, it was through this process that the procurement officer issued two separate addenda modifying and clarifying the RFP to address Protestors' concerns. A requirement that agencies must amend their regulations each time

they introduce a new or novel specification would not only constitute an unnecessary and costly burden on the State at the expense of efficient government, it would no doubt have a chilling effect on the State's ability to take advantage of innovative technologies and services that could greatly benefit the citizens of the State. In the interest of effective administrative process, agencies should retain reasonable power to deal with issues on a case-to-case basis.

We note that the Board's final ruling, however, contained an element of caution with respect to the rulemaking process:

> While it certainly is conceivable that a long term imposition of new procurement policy favoring PLAs could give rise to the necessity of adoption of regulations establishing such a policy through formal rulemaking process, the State's simple reservation of the right to consider certain factors in a single given set of procurement specifications is not tantamount to such enormity of policy change as to necessitate promulgation of new administrative regulations.

*Balfour Beatty, supra,* MSBCA No. 2803 at 10. Should the BPW determine to adopt a PLA policy with widespread application and future effect, or a de facto policy change is evidenced by the ubiquitous inclusion of PLAs in RFPs, then promulgation through rulemaking may be appropriate.

**The PLA Specification Does Not Unduly Restrict Competition**

Appellants contend the PLA technical evaluation factor restricted competition and unlawfully discriminated against Maryland's non-union construction contractors. They maintain that in order for the more restrictive specification to be upheld by the Board, the State was required to produce substantial evidence that the specification was reasonably

related to the needs of the agency. Appellants claim the MSBCA and the circuit court erred by excessively deferring to DGS's justification for the PLA specification, and by failing to require the State to present factual evidence to support its justification.

Our role in reviewing MSBCA decisions is generally narrow and "limited to determining if there is substantial evidence in the record as a whole to support the agency's findings and conclusions, and to determine if the administrative decision is premised upon an erroneous conclusion of law." *Bd. of Physician Quality Assur. v. Banks,* 354 Md. 59, 67–68 (1999) (quoting *United Parcel v. People's Counsel,* 336 Md. 569, 576 (1994)); *accord Salisbury Univ.*, *supra*, 199 Md. App. at 166 (citing *White v. Workers' Comp. Comm'n*, 161 Md. App. 483, 487 (2005)).

Maryland law provides that specifications in a solicitation should be drafted "to encourage maximum practicable competition without modifying the requirements of the State." SFP § 13-205(a)(1). In drafting specifications, a state agency is in a unique position to determine those specifications that most accurately reflect the minimum needs of the State. *Lottery Enters., Inc.*, *supra*, at 7; *Admiral Servs., Inc.*, MSBCA 1341; 2 MSBCA ¶ 159, at 2 (1987); COMAR 21.04.01.04. State agencies are, therefore, afforded great discretion in determining their own needs. *Id.*

When reviewing a procuring agency's specifications, the MSBCA will defer to the technical judgment of the procuring agency unless it is clearly erroneous. *Siems Rental & Sales Co., Inc.*, MSBCA 1609; 3 MSBCA ¶ 288, at 4–5 (1991); *Adden Furniture, Inc.*, MSBCA 1219; 1 MSBCA ¶ 93, at 4 (1982). We, in turn, review the Board's factual

32

findings using the substantial evidence test. *Banks*, 354 Md. at 67. Because substantial evidence review is a "reasonableness" review, we give great deference to the MSBCA's findings of fact. *Id.* at 68. Applying this test, we review the decision of the MSBCA and ask whether, based on the evidence, "a reasoning mind reasonably could have reached the factual conclusion the agency reached." *Dickinson-Tidewater, Inc. v. Supervisor of Assessments of Anne Arundel Cnty.*, 273 Md. 245, 256 (1974); *see also Mayor of Annapolis v. Annapolis Waterfront Co.,* 284 Md. 383, 398–99 (1979) ("The heart of the fact-finding process often is the drawing of inferences made from the evidence . . . . The court may not substitute its judgment on the question whether the inference drawn is the right one or whether a different inference would be better supported. The test is reasonableness, not rightness." (citation omitted)). It is the province of the administrative agency, not the appellate court, to resolve conflicting evidence and draw inferences from that evidence. *Colburn v. Dep't of Pub. Safety & Corr. Servs.*, 403 Md. 115, 128 (2008). Accordingly, the narrow question before this Court is whether the record contains sufficient evidence to allow the MSBCA to conclude that the inclusion of the PLA specification was not unreasonably restrictive and was reasonably related to the needs of the agency.

As noted above, both public and private construction projects have successfully employed PLAs. The Supreme Court has rejected arguments that PLAs are inappropriate for use by a public entity. *See Bldg. & Const. Trades Council of Metro. Dist. v. Associated Builders & Contractors of Massachusetts/Rhode Island, Inc.* (*Boston Harbor*),

33

507 U.S. 218 (1993) (holding that in the construction industry PLAs are valid prehire agreements under sections 8(e) and (f) of the National Labor Relations Act). In *Boston Harbor*, the Supreme Court recognized that an agency entering into a large-scale construction agreement may determine that the requirement of a PLA as a bid specification would serve the interests of the State by allowing the State and the contractor to predict and contain costs, and by ensuring a steady supply of skilled labor. 507 U.S. at 231. The Court stated:

> There is no reason to expect [the] defining features of the construction industry to depend upon the public or private nature of the entity purchasing contracting services. To the extent that a private purchaser may choose a contractor based upon that contractor's willingness to enter into a prehire agreement, a public entity as purchaser should be permitted to do the same.

*Id*.

On February 6, 2009, President Obama signed Executive Order 13502, encouraging federal agencies to "consider requiring" the use of PLAs on construction projects where the total cost to the federal government is $25 million or more. Use of Project Labor Agreements for Federal Construction Projects, Exec. Order No. 13,502, 74 Fed. Reg. 6985 (Feb. 11, 2009). In April of 2010 the Federal Acquisition Regulation ("FAR") rule implementing Executive Order 13502 was issued and the federal policy has been in effect since that time. *See* Use of Project Labor Agreements for Federal Construction Projects (FAR Case 2009-005), 75 Fed. Reg. 19,168 (Apr. 13, 2010); FAR 22.501-05 (2009); FAR 52.222-33 (2009).

In 2013, Governor O'Malley issued a similar Executive Order encouraging state agencies to consider apprenticeship programs, project labor agreements, and community hiring agreements when engaging in procurement related to large-scale public works projects.[19] 40:20 Md. R. 1614-1615 (Oct. 4, 2013). Executive Order 01.01.2013.05 provides:

> Maryland has a compelling interest in taking steps to ensure the timely, safe, and economical completion of public works projects and public-private partnerships, including steps to guarantee a reliable and secure supply of properly skilled labor personnel through the promotion of apprenticeship programs, and in some cases, project labor agreements;
>
> * * *
>
> Maryland also has a compelling interest in considering the impact on the development of critical job skills needed in construction, and the overall economic benefits to the State of Maryland and its economy;
>
> * * *
>
> Under existing law, state agencies are encouraged to maximize the benefits of state purchasing to the Maryland economy by considering, among other things, the number of jobs expected to be generated for Maryland residents.

Several of Maryland's local governments have also addressed the use of PLAs in procurement contracts. Instructive here is the Prince George's County Council's

---

[19] Executive Order 01.01.2013.05 was issued nearly two years after the Cheltenham Project RFP and is, therefore, not relevant to the question of whether the inclusion of the PLA evaluation factor in the RFP constitutes a new regulation for the purposes of the Maryland APA. It is, however, relevant to analysis of State's justification for using the PLA on a large scale public project and whether it is unduly restrictive.

adoption of CB-16-2011 and CB-39-2013 authorizing county agencies to include a clause that requires the execution and use of a PLA in invitations for bids and requests for proposals issued for construction projects that have an estimated dollar value of $1 million or more. Prince George's County Code §§ 10A-157, 10A-158. The sponsoring bill, dated October 18, 2011, states:

> The County Council finds that Project Labor Agreements provide a reliable means for ensuring that construction projects will be adequately staffed with sufficient numbers of highly skilled and properly trained craft personnel and, therefore, such agreements promote the efficient, economical and safe completion of such contracts, and that for this reason alone, the county has sufficient compelling interest in allowing the use of Project Labor Agreements for construction projects to protect its investments and proprietary interests in such projects.

CB-16-2011 p. 3.

The potential benefits of PLAs cited by each of these executive officials are the very same benefits articulated by DGS in support of the inclusion of the PLA specification here. Before the MSBCA, DGS presented the affidavit of Assistant Secretary for DGS Bart Thomas, which provides, in part:

> The use of a PLA was chosen as an evaluation factor because it gives owners and building contractors a unique opportunity to anticipate and avoid potential problems that might arise and possibly impede progress.
>
> * * *
>
> The use of a PLA will provide a dedicated, trained, and professional work force and provide a boost to the local economy through using

36

the local (union and non-union) work force hired through local union hiring halls.

* * *

The use of a PLA will maximize project stability, efficiency and productivity.

The MSBCA also reviewed the affidavit of Protestors' expert, Anirban Basu, which provides that PLAs are ineffective and cost-inefficient. Mr. Basu's affidavit also asserts that PLAs are anti-competitive when employed in state projects in which the majority of workers in the state are not union members, and that surveys have indicated that "more than 70 percent of surveyed construction contractors in Maryland … were less likely to bid on a PLA-covered public project." The Board acknowledged that while divergent sets of conclusions seem to exist regarding the utility of PLAs, in the face of evenly weighted but diametrically opposed affidavits, the Board would defer to the determination made by DGS. The Board noted that whether Mr. Thomas' opinion is correct or not, the State deliberately reached and holds that opinion. *See Siems Rental & Sales Co., Inc., supra*, ¶ 288, at 3-4 ("Where there is a difference of expert technical opinion, we will accept the technical judgment of the procuring agency unless clearly erroneous." (quoting *Adden Furniture, Inc.*, *supra*, at 4)); *see also Schwartz*, 385 Md. at 554 ("[N]ot only is it the province of the agency to resolve conflicting evidence, but where inconsistent inferences from the same evidence can be drawn, it is for the agency to draw the inferences." (quoting *Gigeous v. E. Corr. Inst.*, 363 Md. 481, 504 (2001))).

The MSBCA considered a number of other points in assessing the restrictive effect of the PLA specification in addition to the affidavits. It found that (1) the presence of a PLA is the sixth of seven ranked evaluation factors; (2) the inclusion of a PLA was not mandatory; (3) there were seven proposals received in response to the RFP; and (4) DGS decided to use the Cheltenham Project PLA specification as a pilot project to evaluate whether such a specification was indeed advantageous to the State. There was significant evidence to support the State's determination that the Cheltenham Project would meet a critical need for the community, including the 2012 evaluation of the facility and evidence that the complexity and importance of the Project would benefit from the organization and guarantees provided by a PLA. Indeed, the record indicates that DGS spent a considerable amount of time evaluating PLAs and consulting with various businesses and agencies regarding their efficacy. Moreover, Mr. Basu's prediction that inclusion of the PLA as an evaluation factor would unduly restrict competition was not borne out by the facts here where DGS received seven proposals.

Appellants attempt to rely on *Siems Rental & Sales Co., Inc.* to assert that DGS is required to come forward with evidence in the form of "verifiable facts" indicating that the PLA specification is necessary to meet the State's needs and advance the government's legitimate interest. While *Siems* does provide that "in the face of protest, *some reasonable facts* upon which the opinion that the specifications meet the State's minimum needs must be shown," neither the MSBCA nor the Maryland Courts have utilized the strict verifiable facts standard as proposed by the Appellants. *Siems Rental &*

38

*Sales Co., Inc.*, at 4 (emphasis added). Rather, where the State has met its minimal *prima facie* burden, the burden shifts to the Appellants to prove by a preponderance of the evidence that the restriction is unreasonable. *Xerox Corp., supra*, at 6; *Alco Power*, B-207252.2, 82-2 Comp. Gen. Proc. Dec. ¶ 433 (1982).

In this matter, DGS, as the procuring agency, met its burden of producing reasonable facts upon which the MSBCA could conclude that the inclusion of the PLA evaluation factor was not unreasonably restrictive and did advance the legitimate interests of the State. With that initial burden met, it was then the burden of Protestors to prove by a preponderance of the evidence that the restriction is unreasonable. *Id.* The MSBCA determined that Protestors failed to do so, and we agree. As the MSBCA observed "every procurement spec [sic] may be fairly deemed to impose upon offerors some level of restriction." *Balfour Beatty Constr. et al.*, *supra*, at 4. Therefore, the MSBCA must determine (1) the degree of that restriction and (2) whether such restriction is reasonable. Even if the evidence adduced left the matter in equipoise, the MSBCA was correct to defer to the judgment of the procuring agency as to the legitimate needs of the State. *Siems Rental & Sales Co., Inc.*, at 3 (citing *Alco Power*, ¶ 433).

Because we find that the one-time inclusion of a PLA evaluation factor in a single RFP did not constitute a new regulation mandating predicate rulemaking under the Maryland APA, and that the MSBCA was presented with sufficient evidence upon which it based its decision, it follows that the judgment of the MSBCA was proper. We affirm the judgment of the circuit court.

39

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY AFFIRMED. COSTS TO BE PAID BY APPELLANTS.**