*Brandywine Senior Living at Potomac LLC, et al. v. Ronald A. Paul, et al.,* No. 2428, Sept. Term 2016.  Opinion filed on April ____, 2018, by Berger, J.

**HEADNOTES**

CONDITIONAL USE APPLICATION - MODIFICATION OF PLANS DURING HEARING - IMPARTIALITY OF TRIBUNAL

A hearing examiner did not impermissibly align himself with a conditional use applicant by suggesting and permitting certain amendments to the conditional use application during the hearing.  Montgomery County Zoning Ordinance § 59-7.3.1.D.3., titled "Amendment of an Application," permits the amendment of an application prior to a hearing under certain circumstances, but is entirely silent as to the amendment of an application during a hearing.  The statutory framework of the zoning ordinance embraces flexibility in the conditional use approval process in order to seek compatibility between a proposed project and the surrounding neighborhood.

CONDITIONAL USE APPLICATION - COMPATIBILITY WITH THE SURROUNDING NEIGHBORHOOD AND CONFORMANCE WITH THE MASTER PLAN - CONSIDERATION OF DEPARTING CONDITIONAL USE

When the zoning ordinance requires the hearing examiner to consider whether a proposed use is "harmonious with and will not alter the character of the surrounding neighborhood in a manner inconsistent with the plan" and requires that any proposed structure "be compatible with the character of the residential neighborhood," the hearing examiner does not err by considering the specific features of the currently existing residential neighborhood, including the departing conditional use.

CONDITIONAL USE APPLICATION - REASONING OF THE HEARING EXAMINER - NOISE - STORMWATER DRAINAGE

A hearing examiner's determinations with respect to noise impacts and stormwater drainage were supported by evidence and the appellate court would not reweigh conflicting testimony, including expert testimony, on these issues.

CONDITIONAL USE APPLICATION - UNDUE HARM TO ECONOMIC VALUE OF NEIGHBORING PROPERTY

When a hearing examiner was required pursuant to Montgomery County Zoning Ordinance § 59-7.3.1.E.g.i. to analyze whether a proposed use would cause "undue harm to the neighborhood as a result of . . . adverse effect . . . to economic value of abutting and confronting properties," the hearing examiner did not err by considering an existing

departing conditional use. The effect of a proposed conditional use on a neighboring property's value must be evaluated against the specific, actual current value of the property, not based upon a hypothetical alternative for the proposed conditional use site.

<u>REPORTED</u>

<u>IN THE COURT OF SPECIAL APPEALS</u>

<u>OF MARYLAND</u>

No. 2428

September Term, 2016

_____

BRANDYWINE SENIOR LIVING AT
POTOMAC LLC, ET AL.

v.

RONALD A. PAUL, ET AL.

_____

Eyler, Deborah S.,
Berger,
Fader,

JJ.

_____

Opinion by Berger, J.

_____

Filed:  April 30, 2018

This appeal arises from a decision of the Montgomery County Board of Appeals (the "Board") granting an application for a conditional use filed by Brandywine Senior Living at Potomac, LLC ("Brandywine"). Brandywine received conditional use approval for a three-story residential care facility, to be built on property located at 10800 Potomac Tennis Lane in Potomac, Maryland (the "Property"). Ronald A. Paul and Toni H. Paul, whose residence abuts the Property, as well as the West Montgomery County Citizens Association ("WMCCA"), the Brickyard Coalition ("Brickyard"), and Curtis B. Uhre (collectively, the "Neighbors")[1] filed petitions for judicial review in the Circuit Court for Montgomery County. The circuit court affirmed in part and reversed in part the decision of the Board and remanded to the Board for further consideration. All parties appealed.[2]

The parties have presented multiple issues for our consideration on appeal, which we have consolidated and rephrased as follows:

I. Whether the hearing examiner erred by permitting Brandywine to submit modified plans in response to various issues raised by the opposing parties.

II. Whether the hearing examiner's findings were supported by substantial evidence and premised upon accurate conclusions of law.

---

[1] Certain arguments discussed in this appeal are advanced only by the Pauls, others by WMCCA, Brickyard, and Mr. Uhre (but not the Pauls), and still others by all of the Neighbors, including the Pauls. The Pauls filed one brief in this appeal, and WMCCA, Brickyard, and Mr. Uhre filed a separate brief. Each joined certain arguments expressed in the briefs filed by other parties.

[2] The County and Brandywine are designated the appellants/cross-appellees. The Pauls and the other Neighbors are designated the appellees/cross-appellants. The Pauls and the other Neighbors each appealed separately.

For the foregoing reasons, we shall affirm the opinion of the Board granting the conditional use. We, therefore, shall remand to the circuit court for the entry of an order affirming the Board's actions in their entirety.

## FACTS AND PROCEEDINGS

The Property is a triangular 4.02-acre parcel located in the RE-2 zone, approximately 600 feet north of the intersection of Falls Road (Maryland State Route 189) and Potomac Tennis Lane. The RE-2 zone is zoned for large-lot residential use, with a minimum lot size of two acres. For over forty years, the Potomac Tennis and Fitness Club operated on the property pursuant to a conditional use approval granted in 1975.[3] The tennis club's use of the Property included twelve tennis courts, a two-story clubhouse, a storage shed, and forty-nine parking spaces. During the winter months, six of the tennis courts were enclosed in a temporary bubble structure.

The Property abuts the Falls Road Golf Course to the north and east and the Arden Courts dementia-care assisted living facility and Manor Care of Potomac skilled nursing home to the south. Manor Care of Potomac is a two-story, 172-bed skilled nursing home. Arden Courts is a 52-bed dementia care assisted living facility. The Pauls' residential property is adjacent to the west side of the Property. The Pauls' residence is located approximately 155 feet from the joint property line.

---

[3] At the time the tennis club received its approvals, the County referred to such approvals as "special exceptions." "Special exceptions" were renamed "conditional uses" as part of comprehensive revisions to the Montgomery County Zoning Ordinance effective October 30, 2014. *See* Montgomery County Zoning Ordinance § 59-1.4.2. For clarity, we shall use the term "conditional use" to refer both to "conditional uses" and "special exceptions," regardless of the date they were approved and the term in use at that time.

2

The Staff of the Montgomery County Planning Department (the "Technical Staff") defined the boundaries of the Property's surrounding neighborhood and described the area as follows:

> The neighborhood delineated for this Application (See figures 2 and 3 below) is approximately 260 acres in size and extends out from the Subject Property by about 2,000 feet in all directions. To the north, the neighborhood extends to the northern property edge of the Falls Road Golf Course along Eldwick Way and the rear of lots in the Bedfordshire Community. The boundary then turns southwest, following the northwestern edge of the Potomac Glen community to South Glen Road. The southern boundary follows South Glen Road and Democracy Boulevard, and the eastern boundary includes the eastern boundary of the Bullis School located on the east side of Falls Road, and then angles back to follow Falls Road north to Eldwick Way.

> The majority of the neighborhood is comprised of two properties: the Falls Road Golf Course which is a 149 acre property immediately adjacent to the north and east of the Subject Property, and the Bullis School which is a K-12 private education facility located on 100 acres southeast of the Subject Property on the opposite side of Falls Road. The rest of the neighborhood is primarily residential with one-family detached houses in the Potomac Glen and Glen Falls communities located southwest of the Site. Immediately to the south of the Site is a Manor Care elderly care facility and directly south of the Manor Care facility is the Normandie Farms Restaurant and Inn. Almost all of the neighborhood is zoned RE-2 with the exception of the lots directly fronting on South Glen Road and Democracy Boulevard which are zoned R-200, and the Glen Falls community which is RE-2/TDR-1.

The Technical Staff provided two aerial photographs and a map illustrating the neighborhood. We have reproduced the figures below:

3



Figure 1

In Figure 1, the Property can be seen in the center of the photograph, with the golf course to its north and east. The two large buildings making up the Manor Care/Arden Courts complex are seen south of the Property. The Paul's home is located on the cul-de-sac on the left edge of the photograph, abutting the Property to the southwest. The Pauls' home is the only residence abutting the Property.

4



Figure 2



Figure 3

5

Figures 2 and 3 are equivalent aerial photos and maps, showing the same area. In Figure 3, the Manor Care/Arden Courts complex is represented by numeral 1 on the map. The Falls Road Golf Course is represented by numeral 2, and the Bullis School is represented by numeral 3. The Property is located in the triangle near the center of the map. The Pauls' property is not identified in Figures 2 or 3.

On July 9, 2015, Brandywine submitted its conditional use application to the Montgomery County Office of Zoning and Administrative Hearings ("OZAH"). Brandywine sought approval for a luxury senior residential care facility with 140 beds in 120 suites (the "Project").[4] The Project includes seventy-three parking spaces, an indoor pool, restaurant-style dining, and various other amenities. The Project further includes extensive landscaping on the Property, including perimeter landscaping, courtyards, a fountain, a pergola, a gazebo, and community garden space.

Pursuant to Section 59-7.3.1.D of the Montgomery County Zoning Ordinance (2014) ("Z.O."), OZAH referred the conditional use application to the Technical Staff for review. On October 2, 2015, the Technical Staff issued a 31-page report recommending approval of the Project, subject to eleven conditions. The Technical Staff also prepared a PowerPoint presentation for its presentation on the conditional use application to the Montgomery County Planning Board (the "Planning Board"). On October 15, the Planning Board met and unanimously recommended approval of the application. The Planning

---

[4] Some units would be double-occupancy.

Board adopted the conditions recommended by the Technical Staff and added two additional conditions.

Thereafter, the matter was referred to the hearing examiner for the OZAH. The hearing began on November 6, 2015, and continued for three additional days on December 3, 2015, December 7, 2015, and January 15, 2016. Over the course of the hearing, the hearing examiner heard testimony from Brandywine representatives, individuals in opposition to the Project, as well as various expert witnesses in the fields of land planning, architecture, landscape architecture, civil engineering, transportation planning, acoustical engineering, and real estate appraisal, among others. The hearing examiner heard testimony on issues relating to, *inter alia*, the Project's conformance with the recommendations of the applicable master plan, the effect of the Project on neighboring properties, and the compatibility of the Project with the surrounding neighborhood.

On December 7, 2015, the Pauls testified about particular concerns relating to the effect the Project would have on their peaceful enjoyment of their property as well as the economic value of their property. The hearing examiner inquired as to whether Brandywine would consider making certain modifications to improve compatibility with the Pauls' property, including relocating the trash enclosure to the east side of the Property, modifying the stormwater management facility proposed along the property line between the Property and the Pauls' property, moving a service drive, and reducing the height of the western facade of the building closest to the Pauls' residence.

Subsequently, Brandywine submitted revised plans addressing many of the concerns raised at the December 7, 2015 hearing. The trash enclosure was moved an

7

additional thirty-seven feet from the shared property line with the Pauls, the service drive was reconfigured, and the stormwater facility was modified and relocated. Brandywine further added a decorative masonry privacy wall and removed the third floor from the western portion of the building closest to the Pauls' property.

On December 15, 2015, the hearing examiner issued a notice to all parties entitled to notice explaining that Brandywine had submitted revised plans amending its application. The hearing examiner informed the parties that the revised plans would be evaluated at the January 15, 2016 hearing. In addition, the hearing examiner forwarded the revised plans to the Technical Staff. The Technical Staff reviewed the revised plans and concluded that the revised plans were "still in conformance with the findings of the Technical Staff Report dated October 15, 2015."

The revisions were discussed in detail at the January 15, 2016 hearing. The Pauls continued to express concern about the proximity of the trash enclosure to their property. In response, Brandywine offered to relocate the trash enclosure to the northeastern side of the Property, on the opposite side of the Property from the shared property line with the Pauls. Brandywine submitted plans reflecting the revised location for the trash enclosure on January 20, 2016. The Technical Staff approved the revised plans on January 29, 2016. Thereafter, the parties were provided with an opportunity to respond to the revision and

8

the Technical Staff's review of the revised plans.[5]  The administrative record was closed on February 19, 2016.

On March 21, 2016, the hearing examiner issued a comprehensive 96-page report and decision.  The report addressed the various issues and concerns raised by the parties in opposition.  The report additionally set forth factual findings and applied the factual findings to the various factors set forth in the applicable provisions of the zoning ordinance.  The hearing examiner granted Brandywine's conditional use application subject to sixteen conditions.

The Neighbors subsequently filed requests for oral argument, which Brandywine opposed.  The Board considered the hearing examiner's report at its April 13, 2016 worksession, along with the requests for and oppositions to oral argument.  On April 26, 2017, the Board issued an opinion in which it adopted the hearing examiner's report and decision.  The Board determined that "the record compiled by the Hearing Examiner is thorough and exhaustive, and that the Hearing Examiner's Report [] contains clear and detailed conditions of approval."  The Board further determined that "no further argument is necessary for it to be able to render a decision on [Brandywine's] application."

The Neighbors filed a petition for judicial review of the Board's decision in the Circuit Court for Montgomery County on May 20, 2016.[6]  A hearing was held on

---

[5] Ultimately, the hearing examiner concluded that revisions made after the final hearing date would not be permitted, and the hearing examiner's approval was based upon revisions submitted up to and including December 22, 2015.

[6] The Neighbors filed two separate petitions for judicial review.  One petition was filed by WMCCA, Brickyard, and Mr. Uhre.  The other petition was filed by the Pauls.

9

November 4, 2016. The Neighbors raised several arguments before the circuit court. The Neighbors asserted that the hearing examiner committed prejudicial legal error by permitting Brandywine to amend the conditional use application after the hearing on the application had begun and after the applicant had completed its case. The Neighbors further argued that hearing examiner's findings with respect to noise, adequacy of drainage, and economic value of the Pauls' property were not supported by substantial evidence.

The circuit court issued a memorandum opinion affirming in part and reversing in part the hearing examiner's decision. The circuit court determined that the hearing examiner did not commit prejudicial legal error by permitting Brandywine to amend its conditional use application. The circuit court further determined that the hearing examiner's findings with respect to noise impacts and drainage adequacy were supported by substantial evidence.

The circuit court disagreed with other conclusions of the hearing examiner. In the section of its memorandum opinion titled "Master Plan Compliance and Economic Value," the circuit court concluded that the hearing examiner erred by considering the Property's current use when evaluating the effect of the Project on the character of the neighborhood and on the economic value of the Pauls' property. The circuit court found that the hearing examiner was required to "evaluate the proposed conditional use against the standards of the RE-2 zone, particularly in light of the fact that the existing conditional use on site (the

Brandywine moved to consolidate the two petitions, and the circuit court granted the motion to consolidate. The circuit court subsequently granted the County's motion to intervene.

tennis facility) will be extinguished." The circuit court reversed and remanded the agency's "findings regarding Master Plan compliance and economic value . . . for further consideration, without reference to the existing conditional use on site." All parties noted timely appeals.[7]

Additional facts shall be discussed as necessitated by our discussion of the issues on appeal.

## DISCUSSION

### I. Legal Standard

A conditional use allows a particular use on a property that is not granted to a property owner by right. Certain uses, designated conditional uses, are permitted only after a property owner obtains conditional use approval after a reviewing body, such as the Board, has reviewed and approved an application seeking conditional use approval. *See generally* Stanley D. Abrams, *Guide to Maryland Zoning*.

When reviewing an administrative decision, including a local government's decision to approve a conditional use application, we "look[ ] through the circuit court's . . . decision[], although applying the same standards of review, and evaluate[ ] the decision of the agency." *People's Counsel v. Surina*, 400 Md. 662, 681 (2007). In other words, we

---

[7] Brandywine noted an appeal on January 25, 2017. The County noted an appeal on February 1, 2017. Brandywine and the County are designated the Appellants/Cross-Appellees. The Pauls noted an appeal on February 8, 2017. WMCCA, Brickyard, and Mr. Uhre noted an appeal on February 14, 2017. The Neighbors are designated the Appellees/Cross-Appellants. The Neighbors filed a Motion to Determine Order of Oral Argument, seeking to be designated the Appellants/Cross-Appellees. We denied the Neighbors' motion.

11

"review[] the agency's decision, not the circuit court's decision." *Long Green Valley Ass'n v. Prigel Family Creamery*, 206 Md. App. 264, 273 (2012) (citation omitted). We are limited to evaluating whether there is substantial evidence in the record as a whole to support the agency's findings and conclusions and to determining whether the administrative decision is premised upon an erroneous conclusion of law. *Hamza Halici, et al. v. City of Gaithersburg*, 180 Md. App. 238, 248 (2008) (internal quotation marks and citations omitted).

The substantial evidence test is defined as "whether a reasoning mind reasonably could have reached the factual conclusion the agency reached." *Layton v. Howard Cnty. Bd. of Appeals*, 399 Md. 36, 48-49 (2007) (internal quotation omitted). "In applying the substantial evidence test . . . . [we] must review the agency's decision in the light most favorable to the agency, since decisions of administrative agencies are prima facie correct and carry with them the presumption of validity." *Pollock v. Patuxent Inst. Bd. of Review*, 374 Md. 463, 476-77 (2003). "Furthermore, not only is the province of the agency to resolve conflicting evidence, but where inconsistent inferences from the same evidence can be drawn, it is for the agency to draw the inferences." *Id.* at 477 (internal quotations omitted).

We review the Board's conclusions of law *de novo*, however, "'a degree of deference should often be accorded the position of the administrative agency.'" *Assateague Coastkeeper v. MDE*, 200 Md. App. 665, 690 (2011) (quoting *Najafi v. Motor Vehicle Admin.*, 418 Md. 164, 173–74 (2011)). Although "[a]n administrative agency's interpretation of a statute that the agency administers should ordinarily be given

12

considerable weight by reviewing courts," *Piney Orchard Cmty. Ass'n*, 231 Md. App. at 92 (citation omitted), we owe no deference to an agency's erroneous conclusions of law. *See Bd. of County Com'rs for St. Mary's County v. S. Res. Mgmt., Inc.*, 154 Md. App. 10, 34 (2003) ("[W]here an administrative agency renders a decision based on an error of law, we owe the agency's decision no deference.") (citations omitted). "In contrast to administrative findings of fact, questions of law, including the proper construction of a statute, are subject to more plenary review by the courts." *Maryland Office of People's Counsel v. Maryland Pub. Serv. Comm'n*, 226 Md. App. 483, 501 (2016) (quoting *Office of People's Counsel v. Maryland Pub. Serv. Comm'n*, 355 Md. 1, 14 (1999)). It is the appellant's burden, however, to establish that the agency erred as a matter of law. *Assateague Coastkeeper*, 200 Md. App. at 690.

## II.    Brandywine's Amendment of the Conditional Use Application

The Pauls assert that the hearing examiner committed prejudicial legal error by failing to conduct a fair and impartial hearing. The Pauls contend that, by inviting Brandywine to modify their application and file new plans to respond to issues raised by the opposition, the hearing examiner improperly aligned himself with Brandywine and thereby violated the Pauls' rights to due process. In our view, the Pauls mischaracterize the nature of the hearing examiner's conduct. As we shall explain, the hearing examiner acted within the scope of his discretion in permitting the amended conditional use application. We reject the Pauls' assertion that the hearing examiner's conduct in suggesting and allowing the amendments was improper.

13

The Pauls acknowledge that "under appropriate circumstances . . . an application that is subject to an administrative hearing process might be able to be amended." They emphasize that "[h]ere, the issue is the impropriety of the tribunal in, essentially, aligning itself with the applicant." First, we observe that although the Pauls challenge the hearing examiner's impartiality on appeal, this particular issue was not raised before the hearing examiner. Such an allegation could have been raised through a motion for recusal. *See Regan v. State Bd. of Chiropractic Exam'rs*, 355 Md. 397, 408-10 (1999) (discussing recusal in the administrative context). The issue before the hearing examiner was whether the amendment of the application was permissible under the zoning ordinance, not whether the hearing examiner had aligned himself with Brandywine. Arguably, this issue is not preserved. *See Halici*, *supra*, 180 Md. App. at 249 ("[A] party who knows or should have known that an administrative agency has committed an error and who, despite an opportunity to do so, fails to object in any way or at any time during the course of the administrative proceedings, may not thereafter complain about the error at a judicial proceeding.") (internal quotation omitted).

Furthermore, assuming *arguendo* that issues relating to the hearing examiner's alleged bias are properly before this Court, we observe that the record as whole reflects that the Pauls' assertions are without merit and fail to overcome the " strong presumption in Maryland" that judges, as well as decision-makers in judicial or quasi-judicial proceedings, "are impartial participants in the legal process, whose duty to preside when qualified is as strong as their duty to refrain from presiding when not qualified." *Regan*, *supra*, 355 Md. at 410-11.

14

Our review of the record as a whole leads us to conclude that the hearing examiner did not impermissibly align himself with Brandywine by suggesting and permitting the amendments to the conditional use application, thereby depriving the Pauls of due process. Indeed, administrative proceedings are inherently more flexible than judicial proceedings. *See Cecil Cty. Dep't of Soc. Servs. v. Russell*, 159 Md. App. 594, 612–13, (2004) ("Procedural due process in administrative law is recognized to be a matter of greater flexibility than that of strictly judicial proceedings.") (quotation omitted). "The concept of due process requires that we examine 'the totality of the procedures afforded rather than the absence or presence of particularized factors.'" *Id.* (quotation omitted).

The Pauls assert that it was improper for the hearing examiner to suggest that Brandywine make any changes to its application. The OZAH rules, however, grant the hearing examiner the authority to "regulate the course of the hearing" and "produce evidence when necessary." Moreover, the zoning ordinance similarly reflects the flexibility of the administrative proceeding, providing that the hearing examiner may "extend the time for closing the record, either to a time certain or for a reasonable time . . . if the [h]earing [e]xaminer finds additional information or government action is necessary on any relevant issue." Z.O. § 7.6.2.B.3.b.

Furthermore, we emphasize that the hearing examiner informed Brandywine that it could choose to proceed with its original conditional use application -- which had already been recommended for approval by the Technical Staff and the Planning Board -- or proceed by amending the application to ameliorate the concerns raised by the Pauls at the

15

hearing.[8]  After electing to proceed with the amended application, Brandywine recalled its witnesses and presented two additional witnesses to testify as to the amended plans.  The Pauls assert that the hearing examiner improperly relieved Brandywine of its burden of proof.  We disagree.  Indeed, the record reflects that Brandywine propounded evidence and appropriately bore the burden of establishing that the Project satisfied all of the applicable standards for the approval of a conditional use.

The Pauls assert that their due process argument "is *not* about notice and opportunity to be heard" but, rather, "is much more fundamental."  The crux of the Pauls' assertion is that the hearing examiner violated due process by suggesting Brandywine amend its application in response to the issues raised by the Pauls.  Notice and opportunity to be heard are, however, the critical issues when determining whether a party has been deprived of procedural due process.  We have emphasized, in the context of cases considering "the authority of administrative agencies to rely on post-hearing evidence, as long as there exists opportunity for cross-examination and rebuttal" does "not depend upon which side the additional evidence supports or upon the weight of the additional evidence compared with the evidence at the initial hearing."  *Maryland State Police v. Zeigler*, 330 Md. 540, 561 (1993).  The Pauls were provided with notice of the amended application and a full

---

[8] The hearing examiner explained: "[Brandywine] doesn't have to make any of these changes, they can go forward with their plans exactly as they are and then I will have to evaluate it in the context of all the evidence I've heard."

16

opportunity to be heard.[9]  The Pauls, therefore, were not deprived of procedural due process.

In addition to challenging the impartiality of the hearing examiner, the Pauls challenge the hearing examiner's reasoning for accepting the amended application submitted by Brandywine.[10]  As we shall explain, the amendments were permissible under the zoning ordinance and OZAH rules.

The Pauls contend that the hearing examiner improperly relied upon OZAH Rule 22.0 to support his acceptance of the amended application.  The Pauls assert that the hearing examiner's interpretation of Rule 22.0 is inconsistent with Z.O. § 59-7.3.1.D.3.a, and that the zoning ordinance is controlling rather than Rule 22.0.  In our view, no conflict exists between the ordinance and the rule.

---

[9] The Pauls contend that Brandywine failed to include summaries of expert testimony with the amendments to the application in violation of OZAH Rule 3.4.3, depriving them of notice.  Rule 3.04, however, governs only the applicant's pre-hearing submission which must be filed and served at least thirty days before the initial hearing date.  Furthermore, the Pauls do not -- and cannot -- dispute that they received copies of the amendments as well as notice from the hearing examiner.  The Pauls took advantage of their opportunity to be heard by cross-examining Brandywine's witnesses about the amended application and by providing rebuttal testimony.

[10] The Pauls repeatedly emphasize that Brandywine never formally filed a motion to amend the conditional use application for the Project.  Although the Pauls are correct that Brandywine did not file a particular paper titled "Motion to Amend," the record reflects that Brandywine's December submission of an amended application, including a detailed cover letter and technical plans, amounted to a motion to amend and put all parties on notice of the proposed changes.  The hearing examiner did not err by treating the amendments as a motion to amend the conditional use application. *See Corapcioglu v. Roosevelt*, 170 Md. App. 572, 590 (2006) ("It is well established in Maryland law that a court is to treat a paper filed by a party according to its substance, and not by its label.").

OZAH Rule 22.0 governs modifications to a conditional use application, providing that "[a]pplicants may modify a conditional use application before the public hearing by filing a motion to amend the application with the [h]earing [e]xaminer." Rule 22.3 provides that "[n]o written notice is required for amendments made during a public hearing."

Z.O. § 59-7.3.1.D.3., titled "Amendment of an Application," provides:

> An applicant may amend the application before the hearing if the [h]earing [e]xaminer approves a motion to amend after giving 10 days' notice to all parties entitled to original notice of filing. If an amendment would materially alter an applicant's proposal or evidence, the [h]earing [e]xaminer may postpone the hearing to a date that permits all interested parties adequate time to review the amendment.

Z.O. § 59-7.3.1.D.3 is entirely silent as to the amendment of an application during a hearing. We reject the Pauls' characterization of the silence of the zoning ordinance on this issue as somehow forbidding amendment during a hearing. The statutory framework of the zoning ordinance embraces flexibility in the conditional use approval process in order to seek compatibility between a proposed project and the surrounding neighborhood. *See* Z.O. § 59-7.3.1.F.1.a (permitting the hearing examiner to "supplement the specific requirements of this Chapter with any other requirements necessary to protect nearby properties and the general neighborhood"); Z.O. § 59-3.3.2.E.2.C.ii.(i) (permitting the hearing examiner in conditional use applications for residential care facilities to "modify any standards to maximize the compatibility of the building with the residential character of the surrounding neighborhood.").

18

The Pauls further assert that the hearing examiner improperly relied upon this Court's decision in *Concerned Citizens of Great Falls, Maryland v. Constellation-Potomac, L.L.C.*, 122 Md. App. 700 (1998), when he determined that the amendment process was permissible because the parties had been given a fair opportunity for comment and cross-examination. The Pauls assert that the holding of *Constellation* is inapplicable to the instant case.

*Constellation* involved a petition for a special exception for the construction and operation of a senior care home. 122 Md. App. at 704. In that case, the Board of Appeals for Montgomery County accepted plans amended by the applicant on the final day of hearings[11] and closed the record without granting the opposing parties additional time to respond to the amended plans. *Id.* at 706. We held that the Board committed prejudicial error when it permitted the applicant to submit the amended plans and closed the record. *Id.* The hearing examiner discussed our holding in *Constellation*, determining that *Constellation* stands for the proposition that amendments to a conditional use plan during the course of a hearing for the purpose of enhancing compatibility, with sufficient notice to opposing parties and an opportunity to respond, is permitted. We agree that this is the correct reading of *Constellation*, and we are entirely unpersuaded by the Pauls' assertions to the contrary.[12] In the present case, unlike *Constellation*, the opposing parties were

---

[11] The applicant had submitted additional revisions during the hearings, without objection.

[12] The Pauls attempt to distinguish *Constellation* by emphasizing that the earlier revisions submitted in *Constellation* were unopposed and that the amendment on the final day of the hearing was submitted by the applicant. The Pauls again urge that, in this case,

provided with sufficient notice of the revisions to Brandywine's conditional use application and were provided with the opportunity to respond.

The record as a whole reflects that the hearing examiner requested that Brandywine consider amending the Project in order to assuage various concerns expressed by the parties in opposition. The hearing examiner did not coerce Brandywine to make any changes. After Brandywine submitted revised plans, the hearing examiner accepted the plans into evidence after providing appropriate notice to all parties. Furthermore, the hearing examiner provided the opposing parties the opportunity to respond to the amended application. For these reasons, we hold that the hearing examiner did not commit prejudicial legal error by suggesting that Brandywine make certain modifications to the Project and thereafter permitting the amendment of Brandywine's conditional use application.

## III.    The Board's Substantive Determinations

We next turn our attention to the hearing examiner's application of the zoning ordinance standards to Brandywine's application and ultimate decision to grant the conditional use application. The Neighbors take issue with the hearing examiner's findings and conclusions on the Project's conformance with the master plan and compatibility of the surrounding residential neighborhood, noise impacts of the Project, adequacy of storm

---

no motion to amend was ever filed by Brandywine, but rather that the hearing examiner "told Brandywine what to do and it satisfied him." Again, we reject the Pauls' characterization of the hearing examiner's conduct. The hearing examiner did not coerce Brandywine to make any changes to its application. Rather, the hearing examiner made suggestions to enhance compatibility. As we explained *supra*, this was not improper.

20

drainage for the Project, and the Project's effect on the economic value of the Pauls' property. As we shall explain, we shall hold that the hearing examiner's findings and conclusions were supported by substantial evidence and premised upon accurate conclusions of law.

A. *Compatibility with Surrounding Neighborhood and Conformance with Master Plan*

As discussed *supra*, the circuit court reversed the hearing examiner's findings regarding conformance with the applicable master plan, having determined that the hearing examiner was required to "evaluate the proposed conditional use against the standards of the RE-2 zone, particularly in light of the fact that the existing conditional use on site (the tennis facility) will be extinguished." On appeal, Brandywine and the County assert that the circuit court erred and that the hearing examiner's findings as to neighborhood impact and master plan conformance were correct. The Neighbors contend that the hearing examiner inappropriately considered the departing conditional use when considering whether the Project would alter the character of the residential neighborhood. The Neighbors further take issue with the hearing examiner's finding that the Project substantially conforms with the applicable master plan.

1. Residential Neighborhood

The zoning ordinance requires that the hearing examiner, in order to approve a conditional use application, find that the proposed project "is harmonious with and will not alter the character of the surrounding neighborhood in a manner inconsistent with the plan." Z.O. § 59-7.3.1.E.1.d. The zoning ordinance further requires that "[a]ny structure to be

21

constructed, reconstructed, or altered under a conditional use in a Residential Detached zone must be compatible with the character of the residential neighborhood." Z.O. § 59-7.3.1.E.2.

The hearing examiner specifically addressed both of the above-referenced provisions of the zoning ordinance. With respect to whether the Project "is harmonious with and will not alter the character of the surrounding neighborhood in a manner inconsistent with the plan," *see* Z.O. § 59-7.3.1.E.1.d, the hearing examiner observed that "[t]he surrounding neighborhood is by no means exclusively defined by single-family residences." The hearing examiner observed that "[a] tennis club and related facilities currently sit on the subject site" and the Falls Road Golf Course, Manor Care and Arden Courts assisted living facilities, Normandie Farms restaurant, and the Bullis School are nearby. The hearing examiner concluded that "[a]lthough the Pauls' residence and other homes are within the neighborhood to the west of the [Property], the addition of the [Project] would not be 'alter[ing] the character of the surrounding neighborhood,' which is the question posed by the provision." The hearing examiner concluded that the Project "will be harmonious with the neighborhood." The hearing examiner observed that this issue "must be evaluated on a comparative basis . . . because one cannot evaluate whether the neighborhood would be altered without considering what is presently there."[13]

---

[13] The hearing examiner similarly concluded that whether the Project will unduly reduce the economic value of the neighbor's property must be measured while considering the existing use on the Property. We discuss this issue *infra*.

22

The hearing examiner separately addressed whether the Project was "compatible with the character of the residential neighborhood" as required by Z.O. § 59-7.3.1.E.2. The examiner observed that Z.O. § 59-7.3.1.E.2 "requires an examination of the compatibility of the [Project] with the character of the residential neighborhood in which it is located." The hearing examiner observed that the question is "similar to the one raised by [Z.O. § 59-7.3.1.E.1.d.], above, which asked whether the proposed use will be harmonious with the neighborhood or would alter its character." The hearing examiner, however, determined that "in answering the compatibility question raised by § 59-7.3.1.E.2., the Hearing Examiner will not consider the existing use on the site because it will be gone if the subject application is approved." He further emphasized that "[t]he compatibility is not whether the proposed replacement will be more compatible than the existing use on the site, but whether the proposed use will be compatible with the remaining neighborhood after the existing use is replaced."

After setting forth the issue under determination, the hearing examiner analyzed the Project and the particular residential neighborhood in which the Property is located. The hearing examiner observed that "[e]ven without reference to the existing tennis facility, the particular residential neighborhood in question is somewhat unusual in that it is dominated, at least in the immediate vicinity of the [Project], by uses that are distinctly not single-family residential in character - a nursing home (Manor Care); and assisted living facility (Arden Courts); and a golf course (Falls Road Golf Course). In addition, the hearing examiner noted that "[t]wo other major non-residential uses are also in the defined neighborhood, the Normandie Farms restaurant, just to the south of the Manor Care facility,

23

and the Bullis School, located just across Falls Road from the golf course." The hearing examiner emphasized that there is only one single-family residential use abutting the Property, namely, the Pauls' residence. The hearing examiner concluded that although "a significant portion of the neighborhood to the west of the site is occupied by single-family residences, they clearly are not the predominant part of the existing neighborhood especially in the immediate vicinity of the [Property]."

With respect to the style of the Project, the hearing examiner credited the testimony of architect Hal Bolton, who testified that the Project is "designed in an English Tudor style . . . similar to many of the residences in the Potomac neighborhood." Residential features include chimney pods, a rooftop cupola, Tudor detailing, residential windows, copper trim along the roof edge, architectural shingles, a pitched roof, dormers and masonry fireplaces and chimneys, and stone clad exterior walls. The hearing examiner quoted from the Technical Staff's report, observing that "[t]hese architectural elements wrap around the entire building facade for a cohesive look from all directions." The hearing examiner concluded "that the proposed use, a residential care facility designed with residential style architecture, is not out of character with this neighborhood."

The hearing examiner then turned his attention to whether the Project was compatible with the immediate neighbors, specifically, the Pauls. The hearing examiner considered testimony from the Pauls' land planner, James Noonan, who testified that the Project would not be compatible with the Pauls' property. Mr. Noonan had testified that the structure of the Project was "fairly bulky" and would be "quite easily" visible from the Pauls' property "during leaf-off conditions." The hearing examiner also discussed the

24

testimony of Brandywine's land planning expert, Joshua Sloan. Mr. Sloan testified that the Project would be compatible with the Pauls' property, even without considering the subsequent revisions in which the height of the side facing the Pauls' property was reduced by one floor. Mr. Sloan explained that most of the homes in the area were "two and a half stories" tall, due to their peaked roofs. The hearing examiner additionally discussed the testimony of Brandywine's architect, Mr. Bolton, explaining that "[m]any of the homes in the neighborhood . . . reach up similar in height to where this building is." The hearing examiner also considered the Technical Staff's evaluation of this issue, observing that Technical Staff concluded that the Project "is compatible with the character of the residential neighborhood." The hearing examiner further observed that the Planning Board "generally agreed with the analysis of compatibility in the Technical Staff report."

With respect to the Pauls' opposition to the Project, the hearing examiner explained that he understood that their "opposition is heartfelt," but "that does not mean that their fears will be realized or that they reflect the actual impacts of the proposed structure, as modified through the hearing process." The hearing examiner emphasized that the Pauls' home is "much closer" to the Arden Courts facility than it would be to the Project. The hearing examiner also found it "worthy of note" that the Board, several years prior, "faced the same sorts of objections to the Manor Care special exception as the ones raised in this case . . . and found that it would be compatible with the neighborhood, even though the Board recognized that the corner of the assisted living center would be only 60 feet from the Pauls' property line." For these reasons, the hearing examiner found that the Project was compatible with the Pauls' property.

25

The Neighbors assert that the hearing examiner's analysis of the compatibility of the Project with the residential neighborhood was based upon an incorrect application of the law. Specifically, the Neighbors contend that the hearing examiner inappropriately considered the departing conditional use when evaluating the Project's compatibility with the residential neighborhood. The Neighbors cite the Zoning Ordinance's intent statement for the RE-2 zone, emphasizing that "[t]he intent of the RE-2 zone is to provide designated areas of the County for large-lot residential uses. The predominant use is residential in a detached house." Z.O. § 59-4.4.4.A. For this reason, the Neighbors assert that the departing use should never be considered by the hearing examiner, and, instead, the hearing examiner should compare the compatibility of the Project with the residential neighborhood as compared to a scenario in which the Property was redeveloped with large-lot single-family homes. Brandywine asserts that it was proper for the hearing examiner to evaluate Z.O. § 59-7.3.1.E.1.e taking the existing use into consideration, and to evaluate Z.O. § 59-7.3.1.E.2 without taking the prior use into consideration.

The Neighbors attempt to apply a bright line rule forbidding any consideration of the departing use whatsoever. They argue that comparing the departing conditional use with its proposed successor is legal error because Z.O. § 59-7.3.1.E.2 mandates that the proposed conditional use "be compatible with the character of the residential neighborhood." The Neighbors characterize this provision of the zoning ordinance as the local incarnation of the statewide legal framework for evaluation of conditional uses set forth in *People's Counsel for Baltimore County v. Loyola College in Maryland*, 406 Md. 54 (2008). In *People's Counsel*, the Court of Appeals explained that the "analytical overlay

26

for applications for individual [conditional uses] is focused entirely on the neighborhood involved in each case." *Id.* at 102. The Court reiterated the "often-quoted" standard set forth in *Schultz v. Pritts*, 291 Md. 1 (1981):

> We now hold that the appropriate standard to be used in determining whether a requested special exception use would have an adverse effect and, therefore, should be denied is whether there are facts and circumstances that show that the particular use proposed at the particular location proposed would have any adverse effects above and beyond those inherently associated with such a special exception use irrespective of its location within the zone.

*People's Counsel*, *supra*, 406 Md. at 102 (quoting *Schultz*, *supra*, 291 Md. at 15). The Court explained that "*Schultz* speaks pointedly to an individual case analysis focused on the particular locality involved around the proposed site." *Id.*

Nowhere in *People's Counsel*, *Schultz*, or the Montgomery County Zoning Ordinance is there a strict rule categorically prohibiting the consideration of a departing conditional use in any manner whatsoever. In our view, the appropriate standard is somewhat more nuanced. Indeed, the neighborhood in which the Property is located is zoned R-2 residential, and the use of the Property permitted by right is large-lot, single-family homes. While the appropriate standard is certainly not whether a proposed conditional use is *more compatible* or *less compatible* than a departing use, the well-established standard requires an analysis focused on a particular locality. The record in the present case reflects that the hearing examiner properly considered the specific residential neighborhood surrounding the Property when considering whether the Project would be compatible with the neighborhood. As the hearing examiner explained, and as we set forth

27

*supra*, this particular neighborhood included a wide range of non-residential uses, including services for the elderly, a restaurant, a school, and a golf course.

Furthermore, we agree with the hearing examiner's recognition that Z.O. § 59-7.3.E.1.d, the factor regarding whether a proposed use "is harmonious with and will not alter the character of the surrounding neighborhood in a manner inconsistent with the plan," implicitly requires a consideration of the current state of the neighborhood. "Alter" is defined as "to make different without changing into something else." Alter, Merriam–Webster, http://www.merriam-webster.com/dictionary/alter. As the hearing examiner observed, "one cannot evaluate whether [a] neighborhood would be altered without considering what is presently there." The question before the examiner was whether the Project would alter the character of the neighborhood, i.e., make the neighborhood's character different from what it previously was. In these circumstances, the hearing examiner did not err in considering the existing tennis facility.

To be sure, it would be inappropriate for the hearing examiner to simply weigh a departing conditional use against a proposed conditional use and permit any proposed conditional use that is somehow more compatible or less adverse to the residential character of the neighborhood than the departing use. Critically, this is not what the hearing examiner did in this case. The hearing examiner carefully considered requirements set forth in the zoning ordinance and applied them to the circumstances of the particular application under consideration. Accordingly, we hold that the hearing examiner's findings with respect to neighborhood compatibility were supported by substantial evidence and premised upon accurate conclusions of law.

28

## 2.    Substantial Conformance with the Master Plan

The Neighbors further take issue with the hearing examiner's determination that the Project substantially conformed with the recommendations of the applicable master plan. The applicable master plan involved in this case is the 2002 Potomac Subregion Master Plan. The hearing examiner recognized that "the proper interpretation of the master plan was hotly disputed in this case."

The hearing examiner heard testimony from various witnesses about the Project's conformance with the master plan, much of which was summarized in the hearing examiner's report and decision. Various witnesses for the neighbors expressed concerns about issues relating to the green wedge, overconcentration of conditional uses, traffic problems and compatibility, and specific master plan references to five specific sites as appropriate for senior housing. The hearing examiner observed that the plain language of the master plan provides that "[s]enior housing is appropriate throughout the Subregion wherever zoning permits this use, either by right or as a special exception use." The hearing examiner found that "[t]he fact that the [master p]lan also mentions five locations which it identified as probably appropriate does not mean that it excludes other possible locations 'throughout the Subregion.'"

The hearing examiner discussed the expert testimony presented on the issue of master plan conformance, observing that the Neighbor's expert land planner, James Noonan, "did not testify with regard to [m]aster [p]lan conformity." The hearing examiner emphasized that, "[i]n contrast, [B]randywine's land planner, Joshua Sloan . . . found that the [Project] 'was in conformance with [m]aster [p]lan recommendations.'"

29

The hearing examiner further discussed the Technical Staff's findings with respect to master plan conformity, and specifically, addressed the particular issues raised by the opposition. The Technical Staff observed that the master plan "seeks to maintain the low-density 'green wedge'; however, as observed by [Technical] Staff, a residential care facility is allowed as a conditional use. The proposed use meets the specified standards and provides ample landscaping and screening from the neighboring uses."

The hearing examiner quoted from the Technical Staff's analysis of conditional use policy as set forth in the master plan, observing that the Property was not a highly visible site and that "building design, landscaping and screening . . . further complement its surroundings." With respect to avoiding an excessive concentration of conditional uses along major transportation corridors, the hearing examiner observed that Technical Staff found that "the site is not highly visible from Falls Road . . . and will not create additional traffic burdens." Technical Staff further addressed the master plan's identification of particular areas as appropriate for senior housing:

> [T]he [m]aster [p]lan makes specific recommendations . . . of the need for additional housing for the elderly to allow residents the opportunity to age in place within the community. The [m]aster [p]lan recognizes that "[t]he Potomac Subregion does not fully meet its residents needs for senior housing within its boundaries.' It adds that this need for housing will likely increase with time. [Technical] Staff notes that although the [m]aster [p]lan identified prime locations for including elderly housing, it endorses locating senior housing "throughout the Subregion wherever zoning permits this use, either by right or as a [conditional use]."

30

The hearing examiner found that "there [was] no expert testimony in [the] record to contradict the findings of Technical Staff and [Brandywine's] land planner with regard to the [m]aster [p]lan."

It was entirely appropriate for the hearing examiner to rely upon the Technical Staff's detailed analysis of master plan conformance, which had been adopted by the Planning Board. *Archers Glen Partners, Inc. v. Garner*, 176 Md. App. 292, 316 (2007), *aff'd*, 405 Md. 43 (2008) (explaining that a planning board "is entitled to deference" with respect to "interpret[ing] and appl[ying], in light of other provisions, the goals, and limitations contained in generals plans and master plans). *See also Maryland-Nat. Capital Park & Planning Comm'n v. Greater Baden-Aquasco Citizens Ass'n*, 412 Md. 73, 110 (2009) ("It is not unreasonable for the Planning Board to rely on a Staff Report . . . if the Staff Report is thorough, well conceived, and contains adequate findings of fact.").

In our view, there is sufficient evidence in the record which would permit "a reasoning mind [to] reasonably . . . reach[]" the hearing examiner's conclusion that the Project substantially conforms with the applicable master plan. *Layton v. Howard Cnty. Bd. of Appeals*, 399 Md. 36, 48-49 (2007) (internal quotation omitted). We will not substitute our judgment for that of the hearing examiner.

B. *Noise*

The Neighbors assert that the hearing examiner did not correctly address the adverse non-inherent noise impacts of the Project. Pursuant to Z.O. § 59-7.3.1.E.1.g.ii, the hearing examiner was required to find that that Project would "not cause undue harm to the neighborhood as a result of a non-inherent adverse effect alone or the combination of an

31

inherent and a non-inherent adverse effect [as to] noise." The hearing examiner considered the potential noise impact of the Project, concluding that "the proposed conditional use, with the hours of trash pickup and food deliveries along the western driveway restricted by a condition in Part IV of this Report and Decision, will not create undue harm to the Pauls or any other neighbors due to noise."

The Neighbors assert that Brandywine failed to demonstrate that the Project would not create noise that would disturb the Pauls' peaceful enjoyment of their property. The Neighbors presented testimony from acoustical engineer Gerald Henning before the hearing examiner. They contend that Mr. Henning's testimony that the noise associated with trash and delivery trucks would likely exceed the Montgomery County Noise Ordinance was "uncontradicted." The Neighbors further point to Mr. Henning's testimony that even noise levels which satisfy the noise limits under the ordinance would still interfere with the Pauls' peaceful enjoyment of their property because the noise levels would still be substantially higher than average backyard ambient noise levels. The Neighbors contend that there was no testimony that contradicted Mr. Henning's testimony and opinions, and, therefore, the hearing examiner should have denied Brandywine's conditional use application on this basis.

The record reflects that the hearing examiner considered the testimony of Mr. Henning as well as the testimony of Scott Harvey, Brandywine's acoustical engineering expert. Mr. Harvey testified that, in his expert opinion, there would not be any significant adverse noise impacts and that all mechanical equipment could be designed to meet noise ordinance requirements. In addition, the hearing examiner considered and discussed the

Technical Staff's noise analysis. The hearing examiner emphasized that Technical Staff recognized that "[t]here may be potential noise impacts from deliveries and trash pick-up," but noted that this would be limited to three occurrences per week. Furthermore, "evergreen trees and a stone wall enclosure [would] enhance screening already provided by the existing trees." The hearing examiner further explained that the Technical Staff's initial evaluation with respect to noise predated the December 2015 revisions to the plan and that the revised plans included relocating the trash enclosure further from the property line. Additionally, the revisions included a modified vehicle turn-around area "further away from the property boundary."

The hearing examiner considered the evidence presented with respect to the noise impacts of the Project and weighed the conflicting expert opinions of Mr. Henning and Mr. Harvey. "It is the province of the administrative agency, not the appellate court, to resolve conflicting evidence and draw inferences from that evidence." *Balfour Beatty Const. v. Maryland Dep't of Gen. Servs.*, 220 Md. App. 334, 363 (2014). It is not the place of this Court to substitute our own judgment for that of the hearing examiner and weigh the credibility of various expert witnesses. Based upon the evidence presented to the hearing examiner, "a reasoning mind reasonably could have reached the factual conclusion the [hearing examiner] reached" as to noise impacts. *Id.* (internal quotation omitted). Accordingly, we will not disrupt the agency's findings as to potential noise impacts of the Project on appeal.

33

## C. Stormwater Drainage

The Pauls take further issue with the hearing examiner's conclusions as to the adequacy of stormwater drainage for the Project. Pursuant to Z.O. § 59-7.3.1.E.1.f, the hearing examiner was required to find that the Project "will be served by adequate public services and facilities including . . . storm drainage." The Pauls assert that the hearing examiner failed to appropriately address and credit the testimony of their expert land planner, James Noonan, who identified a pipe system included in the plans for the Project that would purportedly deliver water to the western portion of the Property near the boundary with the Pauls' property.

The hearing examiner expressly identified that "[s]tormwater management was an issue in this case based upon the Pauls' testimony that stormwater from the subject site currently flows onto their land." The hearing examiner credited the testimony of Brandywine's civil engineer, Donald Mitchell, who confirmed the existing drainage problem. The hearing examiner further discussed Mr. Mitchell's testimony about ways in which the Project would result in improved stormwater conditions on the Pauls' property:

> According to the testimony of Mr. Mitchell, the amount of stormwater flowing from the subject site onto the Pauls' property will be dramatically reduced by the stormwater management facilities provided for the new use. Mr. Mitchell introduced a diagram to demonstrate that:

>> . . . in existing conditions approximately half an acre or 20,473 square feet of surface area flows by gravity across the ground and flows into the Pauls' property. In proposed condition, this drainage area is reduced by 96.4 percent to a net 746 square feet of surface drainage area that in

34

> ultimate conditions will be flowing to the Pauls'
> property at this northwestern apex of the site.

> Mr. Mitchell noted that these results are not only an
> improvement from current conditions, but also an
> improvement from that which would have been achieved under
> [Brandywine's] original plans.

(References to the administrative record omitted.) The hearing examiner further found that

Brandywine's "engineering evidence was unrefuted at the hearing." For these reasons, the

hearing examiner concluded "that the proposed changes will be a net benefit to the

environment and will dramatically reduce stormwater runoff from the [Property] onto the

Pauls' property."

On appeal, the Pauls acknowledge that they "did not challenge the accuracy of th[e]

surface area computation" credited by the hearing examiner. Instead, they argue that the

hearing examiner addressed "only one aspect of stormwater management" and that the

hearing examiner failed to discuss the pipe system identified by Mr. Noonan. The Pauls

are correct that the hearing examiner did not mention Mr. Noonan's testimony on this topic.

Critically, although this particular testimony was not addressed in the hearing examiner's

report, we have explained that "[t]he opportunity for 'meaningful' review [of an

administrative decision] is not necessarily an opportunity for exhaustive review of every

possible basis for a petitioner's challenge." *Accokeek, Mattawoman, Piscataway Creeks*

*Communities Council, Inc. v. Maryland Pub. Serv. Comm'n*, 227 Md. App. 265, 288, *aff'd*

451 Md. 1 (2016). Furthermore, Mr. Noonan did not testify as an expert in stormwater

management, and the hearing examiner specifically commented upon Mr. Noonan's lack

of expertise in this area. Accordingly, we reject the Pauls' challenge to the hearing examiner's finding with respect to the adequacy of stormwater drainage.

### D. *Undue Harm to the Economic Value of the Pauls' Property*

Last, we address the Neighbors' challenge to the hearing examiner's conclusion that the Project would not cause undue harm to the economic value of the Pauls' property. On appeal, the Neighbors raise multiple challenges to the hearing examiner's conclusion on this issue. The Neighbors assert that the hearing examiner erred by considering the presence of the tennis facility when evaluating undue harm to the economic value of the Pauls' property. The Neighbors further assert that the hearing examiner improperly conflated the economic value of the Pauls' property with the fair market value of the Pauls' property. We are unpersuaded by either contention, but we address each in turn.

### 1. Consideration of Tennis Facility

The hearing examiner analyzed whether the Project would cause "undue harm to the neighborhood as a result of . . . adverse effect" in the category of "economic value . . . of abutting and confronting properties" as required by Z.O. § 59-7.3.1.E.g.i. The hearing examiner observed that this analysis must be evaluated "on a comparative basis" taking into account the existing tennis facility because a determination of "[w]hether the proposed new use on the [Property] will unduly reduce the economic value of the neighbor's property, in comparison with its present economic value . . . cannot be measured without considering the economic impact on the neighbor of the existing use."

When considering whether the Project caused undue harm to the economic value of the Pauls' property, the hearing examiner considered testimony from the Pauls' expert

36

witness, Ronald Danielian, and Brandywine's expert witness, Donald Boucher. Mr. Danielian, a realtor, testified that the Project would have a stronger detrimental effect on the value of the Pauls' property than the tennis facility had previously. Mr. Boucher disagreed. The hearing examiner credited Mr. Boucher's testimony, finding that "the economic impact of the [Project] on the Pauls' property is likely to be no greater than the economic impacts of the existing tennis facility, the Manor Care facility and the Arden Courts facility, all of which are already adjacent to the Pauls' property." The hearing examiner explained that "[i]f there were only single-family residences adjacent to the Pauls' property," his "conclusion might be been different." The hearing examiner explained:

> [H]owever, with the already existing adjacent facilities, the Hearing Examiner must conclude that the replacement of an existing impactful tennis facility with the proposed facility, designed to look residential in appearance, will not materially change the economic impacts on the Pauls' property.

The Neighbors assert that it was error for the hearing examiner to consider the current economic value of the Pauls' property, with the tennis facility next door, when evaluating the Projects effect on the Pauls' property's economic value. Instead, the Neighbors propose that the economic value of the Pauls' property with the Project next door should be evaluated against the economic value of the Pauls' property with two hypothetical detached single-family residences next door. The Neighbors assert that such an analysis is reasonable if one assumes development of the Property "with houses as large as any in the neighborhood, or possibly even larger, as development standards would permit."

37

We disagree that such a hypothetical analysis is the appropriate standard. The zoning ordinance specifically requires an analysis of whether a proposed conditional use will cause "undue harm to the neighborhood" by causing an "adverse effect" to the "economic value . . . of abutting and confronting properties." Z.O. § 59-7.3.1.E.g.i. In order to determine whether there is likely to be an adverse effect on the economic value of a particular property, one needs to have a baseline for comparison. Principles of conditional use/special exception jurisprudence dictate that the analysis must consider the proposed conditional use's potential effects on the specific locality involved, not to a typical neighborhood within the same zone. *See*, *e.g.*, *Montgomery Cty. v. Butler*, 417 Md. 271, 305, 9 A.3d 824, 844 (2010) ("[I]t is for the zoning board to ascertain in each case the adverse effects that the proposed use would have on the *specific, actual* surrounding area.") (emphasis in original).

Similarly, the effect of a proposed conditional use on a neighboring property's value must be evaluated against the *specific*, *actual* current value of the property, not against a theoretical value based upon a hypothetical alternative for the proposed conditional use site. Indeed, we have further concerns about the actual feasibility of such an analysis. The Neighbors urge that the analysis could be undertaken by assuming development with houses "as large as any in the neighborhood," but the effect on an abutting property's economic value could vary significantly depending upon the property's location on the lot, landscaping, and architectural style. For these reasons, we hold that the hearing examiner properly considered the effect of the Project on the economic value of the Pauls' property, taking into consideration the existing tennis facility.

38

## 2. Economic Value/Fair Market Value

The Pauls assert that the hearing examiner failed to recognize the distinction between "economic value" and "fair market value" and inappropriately evaluated the evidence with a viewpoint that the distinction between the two was "not consequential." The Pauls further contend that this was legal error.

The hearing examiner expressly addressed this issue in his report and decision:

> There was a considerable exchange throughout the hearing as to whether the inquiry should be addressed to economic value, market value or fair market value, and how to factor in the differing expertise of the competing experts (Mr. Danielian for the opposition and Mr. Boucher for the Applicant), with the Applicant's expert being qualified as a real estate appraiser and the oppositions' expert being qualified as a realtor. For purposes of this hearing, the distinction between these terms is probably not consequential. Although Mr. Danielian's testimony may be couched in terms of market price and Mr. Boucher's testimony is couched in terms o[f] appraised value, they are actually both addressing the same issue -- the potential for adverse effects from having a conditional use next door, which the Zoning Ordinance capsulizes in the term "economic value." The Hearing Examiner will evaluate the effects on economic value because that is the standard specified in Section 59-7.3.1.E.1.g of the Zoning Ordinance.

The Pauls contend that "economic value" is defined as "concrete purchasing power; the specific quantity of another object for which a given object can be exchanged; a price which can be actually obtained." For this definition, they cite the fourteenth definition of "value" in Webster's New International Dictionary of the English Language, Second Edition (G.&C. Merriam Company, Springfield, Mass. 1947). Mr. Danielian testified that unlike a fair market value based upon an appraisal -- which is a subjective judgment based upon

39

various factors -- the economic value of a property "is the actual price of the property" as agreed by a buyer and a seller.

Although we recognize, on a theoretical level, the distinction the Pauls attempt to draw between economic value and fair market value, we agree with the hearing examiner that the precise distinction is not particularly relevant to the analysis. The requisite standard under the zoning ordinance is an evaluation of the effect of a particular conditional use on the value of an adjoining property.

Critically, the hearing examiner specifically explained that he was evaluating the effect on the Pauls' property's "economic value because that is the standard specified in Section 59-7.3.1.E.1.g of the Zoning Ordinance." Accordingly, we reject the Pauls' assertion that the hearing examiner failed to apply the correct standard. We, therefore, affirm the opinion of the Montgomery County Board of Appeals and remand the case to the circuit court for entry of an order affirming the actions of the Board.

**JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY AFFIRMED IN PART AND REVERSED IN PART. CASE REMANDED TO THE CIRCUIT COURT FOR ENTRY OF AN ORDER AFFIRMING IN ITS ENTIRETY THE DECISION OF THE MONTGOMERY COUNTY BOARD OF APPEALS. COSTS TO BE PAID BY THE APPELLEES/CROSS-APPELLANTS.**